342 F.2d 290
 WORLD PRODUCTS, INC., a Corporation of the State of Ohio (Plaintiff), Appellant in No. 14731,
v.
CENTRAL FREIGHT SERVICE, INC., a Corporation of the State of New Jersey (Defendant), Appellant in No. 14732.
 No. 14731.
 No. 14732.
 United States Court of Appeals Third Circuit.
 Argued October 8, 1964.
 Decided February 15, 1965.
 
 H. Kermit Green, Newark, N. J. (Green & Lasky, by George J. Lasky and Robert B. Silverman, Newark, N. J., on the brief), for appellant in 14731.
 Charles E. Howell, Madison, N. J., for appellant in 14732.
 H. Kermit Green, Newark, N. J., for appellee in 14732.
 Charles E. Howell, Madison, N. J., for appellee in 14731.
 Before KALODNER, GANEY and FREEDMAN, Circuit Judges.
 FREEDMAN, Circuit Judge.
 
 
 1
 This is an action against a warehouseman to recover damages for negligence and breach of a contract of bailment.
 
 
 2
 Plaintiff imported a quantity of pipe fittings from Japan. They ultimately were stored in defendant's main warehouse located in Edgewater, New Jersey. Part of the warehouse extended over the Hudson River.
 
 
 3
 On September 12, 1960, Hurricane Donna struck the area and as a result the tidewaters of the Hudson River rose above the first floor level of the warehouse. Cartons of plaintiff's pipe fittings were damaged by the flood waters.
 
 
 4
 Defendant segregated 1,688 watersoaked cartons of plaintiff's pipe fittings and by arrangement of the parties shipped them to the plaintiff's plant in Ohio. Plaintiff examined some of the fittings on arrival, determined that they could not be salvaged because of corrosion by the salt water and thereupon melted down the entire shipment of 1,688 cartons and sold it as scrap.
 
 
 5
 The trial court, sitting without a jury, found as a fact that although Hurricane Donna was an Act of God, defendant nevertheless was negligent in storing the plaintiff's goods without taking sufficient precautions against the flooding of the warehouse by such a severe storm, and that the negligence was a substantial factor in causing the damage to the plaintiff's goods. The court also found that the limitation of liability provision contained in the warehouse receipt limited the defendant's liability to the plaintiff to $26,271, although the plaintiff claimed $40,797.45, based on a replacement value of the damaged goods of $41,434.13, together with certain additional expenses, less a credit for salvage value.[1]
 
 
 6
 We agree with the conclusions of the court below on the liability of defendant and on the validity of the limitation of liability provision of the warehouse receipt. On this we can add nothing to the reasons well stated by Judge Augelli in his opinion reported in 222 F.Supp. 849.
 
 
 7
 Although defendant's liability is clear, there is a good deal of obscurity in the record on the question of damages.
 
 
 8
 Plaintiff, of course, had the burden of proving damages, and the judgment in its favor must rest upon a finding of the extent and amount of the damages. Although the judgment for $26,271 implies that plaintiff proved damages at least to that extent, the court below made no such express finding. There is simply a statement by the court that "plaintiff has presented evidence that the replacement value of the damaged goods was $41,343.13" and that "in addition plaintiff adds freight and labor charges and deducts salvage value, resulting in a total claim of $40,622.17". We shall, however, assume that from this a finding may be implied that damages were shown at least to the extent of the judgment of $26,271.
 
 
 9
 A careful examination of the record convinces us, however, that there is no adequate factual foundation for the result reached by the trial court in applying the limitation of liability formula.
 
 
 10
 The warehouse receipt limited the liability of defendant to 500 × the base storage rate of .07 cwt. × the weight of the goods. There is no dispute as to the number and type of damaged fittings; they are set out in detail in an inventory (P-4) of the items comprising the 1,688 cartons which defendant sent to plaintiff after the damage occurred. The controversy extends only to the weight to be applied to each item. In applying the formula the trial court accepted defendant's alleged weight of 75,060 pounds and thus found defendant's liability to be limited to $26,271. Plaintiff contends that the weight of the goods was 128,932 pounds; this would raise the limitation of liability to $45,126.20.
 
 
 11
 It is remarkable that neither party offered in evidence records of the railroad which would show the carrier's determination of the weight of the damaged fittings which defendant returned to plaintiff. Such evidence from a neutral source would have unusual probative value. It was, moreover, called for with peculiar force because the fittings were never weighed by either the plaintiff or the defendant, and were melted down and sold as scrap.
 
 
 12
 Both parties relied upon secondhand evidence as to weight. Defendant based its figure on its delivery order (P-11) which accompanied the shipment returned to plaintiff. This document, which defendant prepared, listed 1,688 cartons weighing 75,060 pounds as being "returned for salvage". No one testified how this figure was arrived at. Defendant called a former employee, Arthur, who testified that the delivery order was prepared by one Flaherty, another employee of defendant. Flaherty, however, was never called as a witness. Arthur's testimony shows that the weight which defendant attributed to the various cartons was derived from a list supplied by plaintiff which sets out the gross weight of cartons containing particular types and sizes of fittings. This list was used by defendant to determine the weight of the cartons which it shipped from storage on plaintiff's order as sales were made. The list was also used to determine defendant's storage charges, which were calculated on weight.
 
 
 13
 Although this list or schedule of weights formed the basis of defendant's calculation of the weight of 75,060 pounds, defendant did not produce it. Defendant admittedly received from the plaintiff bills of lading or "Arrival Notices" giving the weights of the original shipments; but it produced no bills of lading or arrival notices.
 
 
 14
 The plaintiff, however, did produce copies of arrival notices (P-21, P-22, P-23), which were sent to the defendant.
 
 
 15
 Defendant's delivery order records as "returned for salvage" 1,688 cartons weighing 75,060 pounds, without any itemization. The detailed inventory, which defendant sent to plaintiff, lists the 1,688 cartons itemized according to the number of cartons for each size and type of fitting. This inventory is a document of fundamental importance. It was made up by defendant and not by plaintiff. There is no dispute that it represents what defendant returned. It designates the shipment by the size and type of fitting and the number of cartons of each size and type. If the weights for the various cartons which are shown on the arrival notices (P-21, P-22, P-23) are applied to the inventory (P-4), the total weight would amount to 127,930 pounds. This documentary evidence is confirmed by other documentary evidence in the record. A schedule showing the weight of the various cartons (P-24) was available for the use of the parties to determine weights in calculating storage charges and credits and debits when shipments arrived for storage and were depleted by sales. If the weights shown on this schedule are applied to the defendant's inventory of the returned shipments (P-4) the total weight of the returned shipment would be at least 127,930 pounds.[2]
 
 
 16
 The arrival notices and the list of weights each completely discredits the weight of 75,060 pounds stated in defendant's delivery order for the returned shipment, a figure which defendant claimed was made up either from these very documents or from a document parent to them.
 
 
 17
 There are, moreover, a number of other documentary items in the evidence which indicate the gross inadequacy of the defendant's claim that the returned shipment weighed 75,060 pounds.
 
 
 18
 The record contains defendant's warehouse receipts for shipments which it received from plaintiff.[3] Each of these warehouse receipts shows the number of cartons and their combined weight. While they do not show the number of cartons for each size and type of fitting, there can be determined from them the average over-all weight per carton with no distinction made as to the particular size or type of fitting. Our calculation shows that these warehouse receipts listed 310,435 pounds of fittings and that the average weight per carton ran from a low of 72.5 pounds to a high of 82.6 pounds, or a general average of 74.9 pounds.[4] This figure strikingly approximates the weight of 127,930 pounds claimed by plaintiff, which shows, when divided by 1,688 cartons, an average weight per carton of 75.7 pounds.
 
 
 19
 In the course of the trial an employee of the defendant read into the record a stipulated list of the dates of withdrawals of fittings from the defendant's warehouses and the number of cartons and the total weight of each withdrawal. We have calculated the combined number of cartons and the combined weights thus listed. They show that there were withdrawn 3,751 cartons weighing 281,782 pounds. The average weight of these cartons is 75.1 pounds. This again confirms the plaintiff's claim.
 
 
 20
 On the other hand, the defendant's claim that the returned shipment weighed only 75,060 pounds is discredited upon similar analysis. The delivery order lists the 75,060 pounds as contained in 1,688 cartons, which would mean an average weight per carton of 44½ pounds. This is slightly more than half the average weight of the cartons shown by defendant's warehouse receipts, and is also slightly more than half the average weight of the cartons shown by the stipulation listing withdrawals from defendant's warehouses.
 
 
 21
 We have then a record which overwhelmingly indicates that a finding of 75,060 pounds as the weight of the returned shipment is clearly erroneous. The finding by the court below accepting it as correct must therefore be set aside.
 
 
 22
 The conclusion is not altered because of the credit which plaintiff gave to defendant for salvage. In its amended complaint filed some months after its original complaint plaintiff gave a salvage credit to defendant of $1,457.25 based on a rate of $43.50 per ton. Calculated on the basis of 2,240 pounds per ton this would show a weight of 75,060 pounds.
 
 
 23
 Any contention that this credit shows plaintiff's acceptance of defendant's claim of a weight of 75,060 pounds for the returned fittings of loses its force in the circumstances of the present case. Plaintiff sued for the replacement value of the fittings in the particular quantities shown on the inventory supplied by defendant. Weight had no relevance to plaintiff's claim for damages, which was calculated by multiplying quantities against replacement value. True, it had relevance in determining the credit for salvage, but plaintiff gave defendant credit for this on the defendant's own figure of a weight of 75,060 pounds, and hence had a right to believe that there would be no controversy regarding it. It was only when the formula regarding the limitation of liability was brought forward at the trial that the weight of the returned fittings assumed significance, and it was then that plaintiff undertook to show that the weight of 75,060 pounds stated on the delivery order was erroneous.
 
 
 24
 The finding as to the weight of the shipment returned and with it the application of the formula for limitation of liability as reflected in the judgment of the court below, therefore must fall. In the present state of the record it would appear from the documentary evidence that the formula should be applied to a weight of 128,932 pounds, or 127,930 pounds, which would raise the limitation of liability to approximately $45,000. But in view of the inadequate state of the record, we believe the interests of justice will best be served by sustaining the plaintiff's appeal and remitting the record to the court below for a fresh hearing limited to damages. The parties will then have an opportunity to present all of the facts which may be available to them on the subject, including possibly the evidence of the railroad's weighing of the returned shipment; and the court below will have the means for determining as a fact the full extent of plaintiff's damages and the extent to which the formula for limitation of liability reduces any damages which are proven.
 
 
 25
 Accordingly, the judgment of the District Court will be affirmed as to liability and vacated as to damages and the cause will be remanded with directions to grant a new trial restricted to the issue of damages, in accordance with this opinion.
 
 
 
 Notes:
 
 
 [1]
 The plaintiff's claim was for $41,434.13 salvage value, plus expenses totalling $1,867.18, or a total of $43,301.31, less credit for salvage of $2,503.86, or a net claim of $40,797.45. The court's opinion states this in the amount of $40,622.17, but the reason for this discrepancy does not appear in the record
 
 
 [2]
 There are trivial discrepancies between the weights shown in P-24, and the weights on the Arrival Notices, P-21, P-22 and P-23. The brief for cross-appellant, p. 22, n. 1, applies to the inventory (P-4) the lower of the weights respectively shown by P-24 on the one hand and P-21, P-22 and P-23 on the other hand. On this method of calculation the total weight amounts to 127,383 pounds
 
 
 [3]
 Exhibits P-15a to P-15f, inclusive. All of these exhibits are on the appropriate form except P-15a, which is on an invoice form, but the testimony was that the facts set out in it reflect what would have been on the lost warehouse receipt
 
 
 [4]
 
 Calculation from
 Quantity Exhibit of Weight
 Exhibit of Cartons Weight Per Carton

 P-15a 1,106 82,373 74.5
 P-15b 1,247 92,011 75.5
 P-15c 248 18,639 75.1
 P-15d 282 20,469 72.5
 P-15e 20 1,654 82.6
 P-15f 1,241 95,289 76.9
 ______ _______ ____
 4,144 310,435 lbs. 74.9 lbs.