168 N.J. Super. 283 (1979)
402 A.2d 979
THE UPJOHN COMPANY, A CORPORATION, PLAINTIFF-APPELLANT,
v.
R.D. TIMPANY, TRUSTEE OF THE CENTRAL RAILROAD OF NEW JERSEY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued April 23, 1979.
Decided May 15, 1979.
*285 Before Judges CONFORD, PRESSLER and KING.
Mr. Steven E. Brawer argued the cause for appellant (Lum, Biunno & Tompkins, attorneys).
Mr. E. Neal Zimmermann argued the cause for respondent (Conway, Belsole & Gardner, attorneys).
The opinion of the court was delivered by KING, J.A.D.
This is an appeal from a summary judgment in favor of defendant dismissing plaintiff's complaint claiming damages to an interstate rail shipment. The trial *286 judge held that the claim was barred by plaintiff's failure to submit a timely notice to the carrier, Central Railroad of New Jersey (CRNJ), within the time required in the bill of lading. Plaintiff contends that the nine-month time limitation was inapplicable because the bill of lading was not in effect at the time of loss.
On March 13, 1973 plaintiff, The Upjohn Company, shipped a tank car of PAPI (a synthetic plastic liquid) from its Houston plant to a terminal and trans-shipping facility in Elizabethport, New Jersey. This facility was known as Through Bulk Service (TBS) and was an operating division of CRNJ. The goods were consigned to "The Upjohn Company, c/o T.B.S. Terminal, Ramp Track, Elizabethport, New Jersey" and arrived on March 22, 1973. Upjohn instructed TBS to hold the tank car at the Elizabethport facility and per instructions to trans-ship piecemeal quantities of the PAPI to tank trucks for shipment to its ultimate customers in interstate commerce. The off-loading of the PAPI was to be done by the carrier's employees.
On April 10, April 23 and May 3 portions of the PAPI were off-loaded and trans-shipped to Upjohn's customer, Bally Case and Cooler, in Bally, Pennsylvania. Each shipment was by truck pursuant to a separate bill of lading. Bally rejected the last two shipments as unsuitable. Samples of the PAPI were then tested by Upjohn and found to be contaminated by moisture. The partially-full tank car was thereafter returned to Upjohn at Houston, arriving on May 31, 1973, and could not be salvaged.
Plaintiff submitted its claim for $32,449.74 in damages on April 23, 1974, more than nine months after the goods were returned to it in Houston. The claim was thereafter rejected by CRNJ on the ground that it had not been presented within nine months after delivery
Plaintiff contends that the time limitation of the bill of lading issued in Texas did not apply once the goods reached the TBS terminal in Elizabethport. Plaintiff asserts that it appointed TBS as its agent to receive the goods on its behalf *287 and that upon arrival the bill of lading expired. Plaintiff argues that this intent was expressed by the consignment to itself, "c/o TBS", and that after delivery a common law bailment was created, ungoverned by the bill of lading.
Liability for damage to interstate shipment of goods is governed by the Carmack Amendment of 1906 to the Interstate Commerce Act, 34 Stat. 595, 49 U.S.C.A. § 20(11):
The Carmack Amendment of 1906, § 20(11) of the Interstate Commerce Act, makes carriers liable "for the full actual loss, damage or injury ... caused by" them to property they transport, and declares unlawful and void any contract, regulation, tariff, or other attempted means of limiting this liability. It is settled that this statute has two undisputed effects crucial to the issue in this case: First, the statute codifies the common-law rule that a carrier, though not an absolute insurer, is liable for damage to goods transported by it unless it can show that the damage was caused by "(a) the act of God; (b) the public enemy; (c) the act of the shipper himself; (d) public authority; (e) or the inherent vice or nature of the goods." * * * Second, the statute declares unlawful and void any "rule, regulation, or other limitation of any character whatsoever" purporting to limit this liability. * * * Accordingly, under federal law, in an action to recover from a carrier for damage to a shipment, the shipper establishes his prima facie case when he shows delivery in good condition, arrival in damaged condition, and the amount of damages. Thereupon, the burden of proof is upon the carrier to show both that it was free from negligence and that the damage to the cargo was due to one of the excepted causes relieving the carrier of liability. [Missouri P.R. Co. v. Elmore & Stahl, 377 U.S. 134, 137-138, 84 S.Ct. 1142, 1144, 1145, 12 L.Ed.2d 194 (1964)]
Initiating carriers are liable for the full amount of any loss, regardless of whether it occurs on the routes of the initiating carrier, any connecting carrier or the delivering carrier. The shipper has the option of proceeding against either the initiating or delivering carrier. Semi Metals, Inc. v. Pinter Bros., 126 N.J. Super. 124, 128 (Law Div. 1973), mod. on other grounds, 135 N.J. Super. 464 (App. Div. 1975), aff'd 70 N.J. 437 (1976).
*288 Carriers are not permitted to limit their liability by contract, either as to time or amount, except as specified by the act. As to time limitation the statute states:
Provided further, that it shall be unlawful for any such receiving or delivering common carrier to provide by rule, contract, regulation or otherwise a shorter period for the filing of claims than nine months, and for the institution of suits than two years * * *. [49 U.S.C.A. § 20(11)]
The uniform bill of lading used by Upjohn contained a standard condition based on this statute:
Sec. 2(b) As a condition precedent to recovery claims must be filed in writing with the receiving or delivering carrier within nine months after delivery of the property * * *. When claims are not filed or suits are not instituted thereon in accordance with the foregoing provisions, no carrier hereunder shall be liable, and such claims will not be paid. [Emphasis supplied]
While this condition is more specific than the statute in requiring that the claim be in writing and that time runs from delivery, these requirements have become "an integral part of the uniform published tariffs and regulations, which a carrier may not waive or be estopped to assert" and are "a safeguard against tariff abuses and discriminations." See Johnson & Dealaman, Inc. v. Wm. F. Hegarty, Inc., 93 N.J. Super. 14, 22 (App. Div. 1966).
In order to prevent discrimination and preferences by carriers and to insure uniform treatment of shippers, the Interstate Commerce Act was designed to regulate the entire shipping transaction. Cleveland, C.C. & St. Louis Ry. v. Dettlebach, 239 U.S. 588, 594, 36 S.Ct. 177, 60 L.Ed. 453 (1915). There the United States Supreme Court reversed a state court, ruling that a limitation on the amount of damages contained in a bill of lading did not apply to goods being held in storage. The court noted that the bill of lading referred explicitly to the warehouse function in the following provision: *289 Property not removed by the party entitled to receive it within 48 hours (exclusive of legal holidays) after notice of its arrival has been duly sent or given may be kept in car, depot or place of delivery of the carrier, or warehouse subject to a reasonable charge for storage and to carrier's responsibility as warehouseman only. [at 590, 36 S.Ct. at 178]
This provision is nearly identical with § 4(a) of the bill of lading in the present case which states that
* * * property not removed by the party entitled to receive it within the free time allowed by tariffs, lawfully on file (such free time to be computed as therein provided) * * * may be kept in vessel, car, depot, warehouse or place of delivery of the carrier, subject to the tariff charge for storage and to carrier's responsibility as warehouseman only. * * *
The Supreme Court in Dettlebach held that there was no basis to deprive the shipper of the damage limitation contained in the contract because the goods were held in storage. The Supreme Court also found that this interpretation conformed to the clear policy of the Interstate Commerce Act. The court noted that the definition of "transportation" had recently been amended to include:
* * * all services in connection with the receipt, delivery, elevation, and transfer in transit, ventilation, refrigeration, or icing, storage and hauling of property transported. [at 593-594, 36 S.Ct. at 180; emphasis in original]
This definition in all material respects is the same as the present definition found at 49 U.S.C.A. § 1(3). The court found that this broad definition reflected a legislative purpose to regulate the many services which might be performed by the carrier, "in order to prevent overcharges and discriminations from being made under the pretext of [rendering] such additional services * * *." Id. at 594, 36 S.Ct. at 180.
*290 In Southern Ry v. Prescott, 240 U.S. 632, 36 S.Ct. 469, 60 L.Ed. 836 (1915), a similar damage limitation provision was held applicable to a shipment of goods which had arrived at their destination and the consignee had paid the freight charges, given a receipt for the goods, but took away only part of them; the rest were permitted to remain with the carrier and were destroyed by fire. The court determined, "the actual service in holding the goods continued and we must look to the bill of lading to determine the legal obligation attaching to that service." Id. at 639, 36 S.Ct. at 472. These facts were not effective to create any special contract apart from the bill of lading.
This doctrine was strengthened in Western Transit Co. v. Leslie Co., 242 U.S. 448, 37 S.Ct. 133, 61 L.Ed. 423 (1917), which again dealt with a damage limitation in the bill of lading. The shipper directed the carrier to hold the goods at a transfer point for further orders. After four months a portion of the goods was stolen. The court held that the reasoning of the previous cases, Dettlebach and Southern Ry. Co. v. Prescott, both supra, was even more persuasive in the case of goods clearly being stored, "in transit." Western Transit Co. v. Leslie & Co., supra at 453, 37 S.Ct. 133. The contention that the carrier had created a separate contract for warehousing by mailing a letter and a copy of its tariff charges to the shipper was rejected on the ground that the goods were already in storage and the tariff simply advised the shipper of the applicable rates. Other cases which have relied on this doctrine include Galveston Wharf Co. v. Galveston H. & S. Ry Co., 285 U.S. 127, 52 S.Ct. 342, 76 L.Ed. 659 (1932); Great Amer. Tr. Corp. v. Indiana Harbour Belt Co., 191 F.2d 865 (7 Cir.1951); Republic Carloading & Dist. Co. v. Miss. Pacific R. Co., 302 F.2d 381 (8 Cir.1962).
We conclude that the trial court did not misconceive the status of the parties. The only contractual agreement between the parties was the bill of lading. We see no basic *291 difference between a limitation on the amount of damages and on the time to present a claim and thus find the above-cited United States Supreme Court cases persuasive.
We think it significant that the parties did not attempt to replace the bill of lading with a warehouse receipt once the goods arrived at the TBS terminal as they might have done in a true warehousing situation. See N.J.S.A. 12A:7-201(1). This fortifies our conclusion that the parties intended the bill of lading to continue to control their relationship pending off-loading and trans-shipment of the goods by CRNJ's employees at Elizabethport to the ultimate consumer. Moreover, the Uniform Commercial Code specifically countenances the insertion of a foreshortened period for presenting claims in a warehouse receipt, stating: "Reasonable provisions as to the time and manner of presenting claims * * * based on the bailment may be included in the warehouse receipt * * *." N.J.S.A. 12A:7-204(3).
The present situation was far from a true storage arrangement. The carrier's own employees were engaged by the shipper to transship portions of the goods from time to time from CRNJ's terminal to ultimate consumers in interstate commerce through other carriers. We do not accept plaintiff's contention that its self-designation as consignee at the TBS Terminal removed the goods from transportation under the Interstate Commerce Act and from the scope of the bill of lading.
Affirmed.