MITSUI & COMPANY (USA) INCORPORATED, Plaintiff,

Geismar & Company Incorporated, Plaintiff-Intervenor-Appellant,

v.

HUDSON TANK TERMINALS CORPORATION, Defendant-Appellee.

No. 529, Docket 85-7588.

United States Court of Appeals, Second Circuit.

Argued Dec. 2, 1985.

Decided May 7, 1986.

Robert B. Davidson, New York City (Nancy Nelson, Baker & McKenzie, New York City, of counsel), for plaintiff-intervenor-appellant.

Kenneth R. Feit, New York City (Tell, Cheser & Breitbart, New York City, of counsel), for defendant-appellee.

Before FRIENDLY,* CARDAMONE, and WINTER, Circuit Judges.

CARDAMONE, Circuit Judge:

This appeal deals with rights of action against a bailee under Uniform Commercial Code (U.C.C.) § 2–722 (1978). Goods held by a bailee were damaged through its negligence, causing injury both to the seller and buyer of the goods. The seller settled its damage claim against the bailee. The novel question presented is whether U.C.C. § 2–722 now precludes recovery by the buyer for its damages against the bailee. The district court concluded that the buyer lacked standing to sue. While in our view the buyer—as well as the seller—has a right of action to sue, the statute does not permit both to recover for the same loss. In this case, therefore, the value of granting to the buyer a right of action is not worth much thanks since the seller has already settled with the bailee for the maximum damages allowed by the storage contract. Yet, to permit a double recovery against a bailee who has limited its potential loss by agreement would do even less to advance the affairs of business under the Commercial Code. Hence, we affirm.

Geismar & Co., Inc. (Geismar or buyer) appeals from a judgment of the United States District Court for the Southern District of New York (Stewart, J.) entered on June 21, 1985. After the trial of the action the court granted the motion of Hudson Tank Terminals Corporation (Hudson or bailee) for a directed verdict. The district court found Hudson to have been negligent, but dismissed Geismar's claim in its entirety because under these circumstances it ruled that § 2–722 extinguished Hudson's right of action.

I

Mitsui & Company (U.S.A.), Inc. (Mitsui or bailor or seller) imported 200 metric tons of Paraguayan tung oil that it planned to resell to Geismar. The S.S. Mormacargo (Mormacargo), which transported the tung oil from Paraguay to New York, also carried 600 metric tons of castor oil. On November 4, Hudson contracted with Manhattan Oil Transport of New York to furnish a barge, the Star Craft, to transport to Hudson's storage tanks the tung oil discharged from the Mormacargo. Prior to the transfer and according to industry practice, samples of the tung and castor oils were taken from the Mormacargo's holding tanks. Sample results indicated that the material met American Standards Testing and Materials Specification D–12–75 for Raw Tung Oil (ASTM standards), but failed the beta test. This meant that although the tung oil was uncontaminated when received by Hudson, it was in an isomerized or hardened state, reducing its resale value. The chemical analysis of the castor oil sample revealed no contamination.

On November 6 the tung oil was pumped into a storage tank at Hudson's Weehawken, New Jersey tank farm. Various samples of the oil taken compared favorably with the amount originally sampled from the Mormacargo. Hudson's records for November 6 indicate that the tung oil was transferred from the account of Mitsui to Geismar. Despite the transfer, Hudson issued Mitsui a non-negotiable warehouse receipt for the oil on November 10, 1978. The entire shipment was listed on Geismar's account until November 14, 1978 when Geismar notified Hudson that it rejected the shipment because the oil was in

---

* Judge Friendly participated in oral argument in this case and voted before his death on March 11, 1986 in favor of the disposition reached in this opinion.

beta condition and therefore not in conformity with the original contract specifications. *See* U.C.C. § 2–601. An additional sample of the oil was taken on December 1, 1978 after the oil had been transferred to a tank with more efficient heating coils. This test confirmed the previous results, that is, the oil met ASTM standards but did not pass the beta test.

Because the oil was in beta condition upon arrival in New York, Mitsui's original contract of sale with Geismar was rescinded. Mitsui's insurers, Toplis and Harding, put the oil up for open bidding. Geismar submitted the successful bid on January 31, 1979—confirmed by letter on February 2nd. Geismar received direct confirmation of the purchase from Mitsui by telex on February 5, 1979, and eight days later received additional written confirmation from Mitsui. The subsequent contract described the oil as "Beta Tung Oil quality as it is." On January 31, 1979 Geismar resold the oil by contracts it entered into with two customers, Empire State Varnish Company (Empire) and McClosky Varnish Company (McClosky).

Mitsui directed Hudson by letter dated February 5, 1979 to release 100 metric tons of the tung oil to Geismar. The same letter also indicated that the entire 200 metric tons of tung oil had been sold to Geismar. Hudson's book entries for the Geismar and Mitsui accounts show transfers on February 9 and 16, 1979. Mitsui never transferred to Geismar the warehouse receipt it had received from Hudson. On February 9, 1979 Empire received the tung oil it had purchased from Geismar. Tests conducted at the end of the pumping process revealed for the first time that the oil had become contaminated. Empire thereafter immediately rejected delivery. Additional tests of the Empire sample later revealed that the oil was 25 to 30 percent soluble in alcohol, suggesting castor oil contamination. On February 15, 1979 at Geismar's request the remaining tung oil at Hudson's storage facility was chemically analyzed, confirming that it also was contaminated.

Based on the results of the February 15th test, Geismar recalled its February 16th shipment of tung oil to McClosky. This shipment was returned to Hudson's storage tank and credited to Mitsui's account. On February 16 Geismar notified Mitsui that it was rejecting the entire parcel of beta tung oil it had purchased on February 5, because of the contamination. Although Empire did not demand fulfillment of the beta tung oil contracts, McClosky insisted upon performance. Geismar covered the McClosky contracts at a cost which did not exceed the original average contract price, due to the declining market for tung oil during this period. Thus, Geismar incurred no losses on the cover and never paid Mitsui for the contaminated oil. Mitsui, not Geismar, paid Hudson for the storage of the oil. This remaining oil was later sold for salvage.

In February 1980 Geismar commenced an arbitration proceeding against Mitsui before the American Arbitration Association in San Francisco pursuant to the terms of their agreement. Geismar alleged that Mitsui breached its contract for the delivery of beta tung oil. Mitsui filed a cross-demand for arbitration against Geismar for its failure to accept delivery of the oil in an "as is" condition. After commencement of the arbitration, Mitsui filed suit in April 1980 against Hudson in district court. Mitsui sought, among other damages, indemnification for any losses it might sustain in arbitration. The terms of the written contract of storage specifically provided that the respective rights of the parties shall be determined in accordance with the laws of the State of New Jersey. On July 7, 1981 after two days of hearings the arbitrators declined to award damages either to Geismar or Mitsui.

The district court then granted Geismar leave to intervene in the pending action between Mitsui and Hudson. Subsequently, Mitsui settled its claim with Hudson without prejudice to the rights of Geismar. At trial, counsel stipulated that Mitsui and Hudson settled for $18,777, the maximum damages permitted by the Hudson-Mitsui

storage contract. The warehouse receipt issued to Mitsui provided that Hudson's liability was limited to a sum equivalent to 50 times the base storage rate or any other higher value declared by the depositor.[1] No higher value had been declared. Geismar continued to press its claim in the district court seeking recovery of consequential damages resulting from its inability to fulfill resale contracts for the oil purchased from Mitsui. Geismar's complaint alleged that its damages were caused by Hudson's negligence in failing to store the oil in a proper manner, which resulted in its mixture with castor oil.

## II

The primary issue we address on appeal is whether U.C.C. § 2–722 allows only one right of action on behalf of both the seller Mitsui and the buyer Geismar within the factual context of this case. Hudson argues that § 2–722 allows but a single right of action on behalf of both buyer and seller. Thus, because it settled with Mitsui, Hudson contends that Geismar can no longer maintain a separate, distinct claim based upon the same damage to the same parcel of oil which was the basis of Mitsui's claim against Hudson. Geismar counters that the U.C.C.'s remedies are to be liberally construed under § 1–106 and that the district court's restrictive interpretation of § 2–722 is inconsistent with that direction. It contends that § 2–722 affords both buyer and seller individual and separate remedies for the loss.

Both parties agree that § 2–722 controls. As a preliminary matter, we accept the district court's factual findings that the oil was undamaged as of December 1, 1978, when it was put in Hudson's possession, but 25 to 30 percent contaminated as of February 9, 1979. Therefore, the contamination of the oil occurred at some point

within the time period from December 1 to February 9. The district court made no specific finding as to the exact date of contamination.

Our analysis begins with § 2–722:

Where a third party so deals with goods which have been identified to a contract for sale as to cause actionable injury to a party to that contract

(a) a right of action against the third party is in either party to the contract for sale who has title to or a security interest or a special property or an insurable interest in the goods; and if the goods have been destroyed or converted a right of action is also in the party who either bore the risk of loss under the contract for sale or has since the injury assumed that risk as against the other;

(b) if at the time of the injury the party plaintiff did not bear the risk of loss as against the other party to the contract for sale and there is no arrangement between them for disposition of the recovery, his suit or settlement is, subject to his own interest, as a fiduciary for the other party to the contract;

(c) either party may with the consent of the other sue for the benefit of whom it may concern.

The first question raised is whether Geismar met its initial burden of establishing that the tung oil at issue was identified to the contract prior to Hudson's negligent damage of the goods. Section 2–722 allows a right of action against a third party for injury to goods only "[w]here a third party so deals with *goods which have been identified to a contract for sale....*" (emphasis added). In order to determine whether or not an identification has occurred, reference must be made to § 2–501 which sets

---

1. 19. LIMITATION OF DAMAGES, CLAIMS AND SUIT

a) The depositor declares that damages for all merchandise or commodities stored herein shall be limited to fifty (50) times the base storage rate, unless a higher value is declared by the depositor at the time the goods are stored. In such event, there will be a charge on the higher valuation in addition to the base storage rate, of one-fifth of one percent (⅕ of 1%) per month of the higher valuation. Under no circumstances, however, shall the warehouseman's liability exceed the value so declared by the depositor.

forth the detail and standards by which to test when and how identification is made. Identification of goods can be made by agreement between the parties or, absent such agreement, "when the contract is made if it is for the sale of goods already existing and identified...." U.C.C. § 2-501(1)(a). The district court correctly found that the oil was identified to the Mitsui/Geismar contract on February 5, 1979 when Mitsui confirmed by telex the acceptance of Geismar's bid for the beta oil. The trial court nonetheless failed to address the broader question of whether the February 5 identification occurred prior to the contamination, merely stating, "[w]hile we cannot say exactly how the contamination took place, we are convinced by the weight of the evidence that it occurred while in defendant's care and custody...."

Geismar responds by asserting that an evidentiary presumption obviates its burden of proving the actual date the oil was adulterated. It claims that at trial it met its initial burden of showing that when the oil was delivered to Hudson it was not contaminated. Geismar now argues that it was entitled to a presumption that the oil continued in that state until the date it was discovered to be contaminated, February 9, 1979, or until such earlier date as may have been proven by Hudson.

This argument finds compelling support in long established case law. In *Isler v. F.C. Linde Co.*, 33 Misc. 465, 67 N.Y.S. 1109 (N.Y.Supp.App.Term 1900), the court entertained a case similar to the one at bar. *Isler* involved the delivery of goods to a warehouseman, whose business was sold four years later to a second warehouseman. Sometime after the sale of the business, the plaintiff's goods were discovered to be damaged; the plaintiff sued the successor warehouseman. Before addressing the question of the successor warehouseman's liability, the court noted that if the goods remained in the possession of the initial bailee until delivery to the plaintiff, there would be no doubt of bailee's liability for the damages, since the goods were received in good condition and returned damaged. Plaintiffs need show only these two facts to make out a prima facie case against the warehouseman because a presumption arises that the injuries were caused through the bailee's negligence. "It then becomes incumbent upon the warehouseman to show facts and circumstances tending to rebut the presumption, and where ... shown the plaintiff must [prove] by a preponderance of evidence that notwithstanding the explanation given by the defendant there had been actual negligence on his part, which was the proximate cause of the injury complained of." *Id.* at 467, 67 N.Y.S. 1109.

Because the court accepted the proposition that the successor warehouseman could not be held liable for the original warehouseman's negligence if established, the focus of the case was shifted to determining the sufficiency of the proof required to make out a prima facie case against the second warehouseman. *Id.* at 468, 67 N.Y.S. 1109. Even where there was a change of bailees, the *Isler* court held that once the plaintiff proved that the goods were originally delivered in sound condition to the first bailee, it was entitled to a presumption that the goods remained in that state when the new bailee took them over. "The general rule is, that things once proved to have existed in a particular state, are to be presumed to have continued in that state until the contrary is established by evidence, either direct or presumptive." *Id.* at 469, 67 N.Y.S. 1109 (citations omitted) *quoting Smith v. New York Central R.R. Co.*, 43 Barb. 225, 228 (1864) *aff'd mem.* 41 N.Y. 620 (1869). The court reasoned, "[t]here is no injustice in this, because it is apparent that the defendant was in a very much better position to ascertain the condition of the plaintiffs' property at the time when it assumed control of the same than were the plaintiffs themselves." 33 Misc. at 470, 67 N.Y.S. 1109.

More recently in *Procter & Gamble v. Lawrence American Field Warehousing Corp.*, 16 N.Y.2d 344, 266 N.Y.S.2d 785, 213 N.E.2d 873 (1965), New York's highest

court reached the same result in an analogous situation. In *Procter & Gamble,* the plaintiff, P & G, brought a conversion action against a warehouse corporation, Field, for the nondelivery of soybean oil for which Field issued its non-negotiable warehouse receipts. P & G asserted that in the absence of any proof that the vegetable oil was stolen before reaching defendant's tanks, Field was liable for the merchandise. In the face of the non-negotiable receipts reciting the number of the tank car in which the oil arrived together with month-end statements issued by Field, the court found the evidence conclusive that Field received the oil. *Id.* at 350–51, 266 N.Y.S.2d 785, 213 N.E.2d 873.

*Procter & Gamble* then addressed the more difficult question regarding the measure of damages. "The usual measure of damage, in event of nondelivery of goods by a bailee, is the market value on the date of conversion ... not the date when the bailor learns of the loss or presents his warehouse receipt and demands his merchandise." *Id.* at 352, 266 N.Y.S.2d 785, 213 N.E.2d 873 (citations omitted). The court held that a lower court had erred in fixing the value of the loss at the date when the bailor received notice of the loss simply because the date of the conversion was unknown. It reasoned that a bailee in possession of goods will know more about the circumstances of their damage than the bailor. The bailee should not therefore be allowed to elect the most preferable date for determining market value by giving notice of the loss at that time. When the date of loss is known, the loss is measured from that date but such rule "should not be reshaped to designate the date when the bailor is notified of the conversion if the conversion date is unknown. That would place the bailee in a better legal position by pleading ignorance of the circumstances of the loss than if he knew or revealed the circumstances." *Id.* The court concluded that the bailor should be awarded damages calculated in terms of the highest market value of the goods between the date when the bailment commenced and the date when the bailor received notice that the property was lost. *Id.*

Thus, Geismar is entitled to the presumption that the oil remained in good condition until it was found to be adulterated on February 9, 1979. As recognized by *Procter & Gamble,* there are sound policy reasons supporting this presumption. *Id.* at 352, 266 N.Y.S.2d 785, 213 N.E.2d 873. The means of establishing the date and circumstances of the contamination are peculiarly in Hudson's possession since the proof demonstrated that the oil was uncontaminated when it entered Hudson's tanks. Once the sound delivery of the oil has been demonstrated, Hudson is the party in the best position to have access to, and to offer, rebuttal proof relating to the time of contamination. Under these circumstances, it is a fair burden for the bailee to prove a change in the *status quo.* To rule otherwise would effectively deprive the buyer of any recovery in a case like this, because it would be nearly impossible for it to prove that the contamination occurred after identification of the goods to the contract. With the presumption that the tung oil was still in acceptable condition on February 5, 1979—the date the tung oil was identified to the contract—Geismar has met the threshold requirement of § 2–722 and hence has a right of action against Hudson.

### III

We turn now to the controlling question of whether § 2–722 allows both the seller and buyer to sue a third party tortfeasor and obtain separate recoveries. Both parties agree that § 2–722 was enacted to liberalize the real party in interest rules applicable in many states. It was designed to overturn the rule prevailing in some jurisdictions that only one party could hold title to goods, and only that party had standing to sue a third party for damage to the goods. *See* 3A U.C.C.Rep.Serv. (MB), § 14:11 (1984); U.C.C. § 2–722 official comment (1978).

Geismar asserts that the statutory language and framework of the section pro-

vide for separate suits by both a buyer and a seller. Because there is no direct precedent on this issue, Geismar argues that we must interpret the provision in light of §§ 1–102 and 1–106 which require remedies to be liberally administered. Such a liberal reading, Geismar asserts, requires that a court must "presume the existence of such a remedy and should find against the injured party only when the language of the Code or applicable precedent suggest no other reasonable course." Hudson maintains that allowing both parties a separate recovery ignores the rights of third parties like itself and burdens bailees with paying double damages. Further, Hudson contends, buyers like Geismar are not without remedy. Under other more appropriate U.C.C. provisions, a buyer who has suffered a loss because it did not receive conforming goods has recourse against the seller. *See, e.g.,* U.C.C. §§ 2–711 (general remedies), 2–712 (purchase of substitute goods); 2–713 (non-delivery or repudiation damages); 2–715 (incidental and consequential damages); 2–716 (specific performance or replevin); 2–717 (subtracting damages from the price). The fact that Geismar did not prevail in its arbitration proceeding against Mitsui should not, Hudson contends, induce us to force it to pay twice in order that Geismar obtain a recovery.

Geismar's argument fails to persuade us. Although Geismar had a special property interest in the oil, a plain reading of § 2–722 shows that the seller and buyer possessed a single, collective cause of action to obtain one recovery—not separate, distinguishable claims. As Geismar recognized, there is no direct precedent on this issue and the legislative history is silent on this issue. Thus rather than adopting the liberal reading which Geismar suggests, the normal judicial presumption against double recovery is so strong that some explicit legislative history would be neces-

sary for this Court to grant it, and no such history exists. Examination of the official comment to § 2–722 further reveals that both the seller and the buyer may have a right of action at the same time in certain cases, but there is nonetheless only *one right of recovery.*[2]

■ The district court concluded that Geismar lacked standing to sue after Mitsui had settled with Hudson. The district court reasoned that § 2–722 was not intended to give standing to a buyer in cases where (1) the seller had also brought suit and/or (2) the buyer had revoked acceptance of the goods. The court incorrectly reasoned that Geismar accepted and then revoked acceptance of the oil, calling into play the underlined portions of the official comment "suggest[ing] actions by both buyer and seller are inappropriate." Geismar never accepted the goods; acceptance does not occur until the buyer has had a reasonable opportunity to inspect. *J.L. Taylor & Co. v. Tiemann,* 15 Misc.2d 137, 138, 181 N.Y.S.2d 59 (Schenectady Co. Ct.) (1959); U.C.C. § 2–606(1)(a) & (b). Its first opportunity to inspect the oil occurred when a portion was pumped from Hudson's tank for delivery to Geismar's customer, Empire. On that day, February 9, 1979, the oil drawn from the tank was tested and found to be contaminated. Geismar thereafter promptly rejected on February 16, 1979 in accordance with § 2–602. It did not revoke its "acceptance" under § 2–608. Therefore, the parenthetical phrase in the official comment is inapplicable and "it is possible for both parties to have the right of action."

■ We find that the issue is not one of standing, but whether both parties have a separate right of recovery for the same negligent act. Section 2–722(a) clearly gives both buyer and seller standing to sue,

---

**2.** Purposes: To adopt and extend somewhat the principle of the statutes which provide for suit by the real party in interest. The provisions of this section apply only after identification of the goods. Prior to that time only the seller has a right of action. *During the period between identification and final acceptance (except in the*

*case of revocation of acceptance) it is possible for both parties to have the right of action.* Even after final acceptance both parties may have the right of action if the seller retains possession or otherwise retains an interest. (Emphasis added).

but it does not address the issue of whether double recovery against the bailee is authorized. As we noted previously the legislative history is silent on this question. Moreover, because of the unusual procedural history of this case, no direct precedent exists.[3] Therefore, in concluding that only one right of recovery exists, we apply by analogy precedents established in Article Seven.

Many Article Seven sections also apply to delivery orders as well as ordinary warehouse receipts. Generally a warehouse receipt is issued by a warehouseman, in this case Hudson, to a bailor (Mitsui); the bailor itself issues a delivery order, usually to its buyer (Geismar). J. White & R. Summers, *Uniform Commercial Code* 669 (1972). The transferee of a delivery order (the buyer) does not acquire rights against the warehouseman unless and until the warehouseman accepts the order. *Id. Cf. Procter & Gamble*, 16 N.Y.2d at 358, 266 N.Y. S.2d 785, 213 N.E.2d 873 (citations omitted) ("the holder of the warehouse receipt is entitled to recover for the full value of the merchandise, and the holder of the receipt must then fulfill his obligations to other contracting parties who were not, themselves, entitled to possession of the merchandise at the time of its conversion. This recognized rule in New York State is also law in New Jersey."). According to

official comment 3 to 7–102, *"[w]hen a delivery order has been accepted by the bailee it is for practical purposes indistinguishable from a warehouse receipt.* Prior to such acceptance there is no basis for imposing obligations on the bailee other than the ordinary obligation of contract which the bailee may have assumed to the depositor of the goods." (Emphasis added).

Mitsui directed Hudson by letter dated February 5, 1979 to release the oil to Geismar. Therefore, when Hudson accepted the delivery order from Mitsui for the delivery of goods to Geismar, Geismar acquired rights "indistinguishable from a warehouse receipt." Thus, at that point, both Mitsui, as holder of the warehouse receipt, and Geismar, as a transferee of a delivery order, possessed rights against the bailee. Mitsui exercised its rights first and settled with Hudson for the maximum allowable amount under the warehouse receipt, which under § 7–204(2) permits the bailee, as here, to limit its liability in the event of loss or damage.[4] Geismar's right of action against Hudson under Article Seven principles was therefore extinguished because any right of recovery it possessed came from rights conferred by the warehouse receipts. When the maximum allowable recovery from the receipts had been exhausted by Mitsui, Geismar

---

**3.** In the normal course of events Geismar would have sued Mitsui and Mitsui would have filed a third-party complaint against Hudson. In the alternative, Geismar would have cross-claimed against Hudson. No question of standing would have arisen in either event. This appeal arose because the agreement between Geismar and Mitsui required grievances to be submitted to arbitration. Geismar only intervened in the district court proceeding between Mitsui and Hudson when the arbitrators denied Geismar's claim in its entirety.

**4.** (1) A warehouseman is liable for damages for loss of or injury to the goods caused by his failure to exercise such care in regard to them as a reasonably careful man would exercise under like circumstances but unless otherwise agreed he is not liable for damages which could not have been avoided by the exercise of such care.
(2) Damages may be limited by a term in the warehouse receipt or storage agreement limit-

ing the amount of liability in case of loss or damage, and setting forth a specific liability per article or item, or value per unit of weight, beyond which the warehouseman shall not be liable; provided, however, that such liability may on written request of the bailor at the time of signing such storage agreement or within a reasonable time after receipt of the warehouse receipt be increased on part or all of the goods thereunder, in which event increased rates may be charged based on such increased valuation, but that no such increase shall be permitted contrary to a lawful limitation of liability contained in the warehouseman's tariff, if any. No such limitation is effective with respect to the warehouseman's liability for conversion to his own use.
(3) Reasonable provisions as to the time and manner of presenting claims and instituting actions based on the bailment may be included in the warehouse receipt or tariff.

could not rely on those receipts or on a separate right to recovery to obtain any damages. Just as the warehouse receipts limit recovery under Article 7, so § 2–722 does not authorize a double recovery against the bailee but only liberalizes the standing rules to allow either the buyer or seller or both to commence an action. To hold otherwise would eviscerate the force of § 2–704(2) by allowing actions under § 2–722 to be used to evade limitations on liability by having actions against bailees brought in the name of the buyer rather than the seller. There is no language in § 7–204(2) to support Geismar's argument that the limitation of damages operates only as between the bailor and the warehouseman and not between a purchaser from the bailor and the warehouseman. Sound policy reasons dictate that a warehouseman be protected by a limitation of liability freely entered into with the bailor regardless of any transfers that may be made by the bailor to others and also regardless of whether the bailor does or does not assign the warehouse receipt, which is beyond the warehouseman's control or knowledge. This rule allows all parties to determine the necessary amount of insurance.

## IV

We now briefly address the argument raised by Geismar in answer to a question posed at oral argument. Geismar contends that even if it has no remedy under § 2–722, § 1–103 permits it to look to general principles of tort law to afford it a remedy. Geismar maintains that these principles do not require it to have a prior contract right in the goods—only that Geismar be in the class of foreseeable plaintiffs to whom Hudson, under the facts here presented, owed a duty. Geismar relies primarily on *People Express Airlines, Inc. v. Consolidated Rail Corp.*, 100 N.J. 246, 495 A.2d 107, 116 (1985), in which the New Jersey Supreme Court stated that the underpinnings of such tort liability are the elements of foreseeability and the extent to which the defendant knew or should have known the particular consequences of his negligence.

Geismar's reliance on *People Express* is misplaced. In *People Express* the court addressed as a question of first impression whether negligent conduct that interferes with a party's business resulting in purely economic loss without property damage or personal injury is compensable in tort. *Id.* 495 A.2d at 108. Further, we note that Geismar was not in the class of foreseeable plaintiffs to whom Hudson owed a duty beyond the obligations assumed in the warehouse receipt. Provisions in warehouse receipts limiting a warehouseman's liability and providing shortened periods of time for commencement of suit are specifically authorized by U.C.C. § 7–204(2) and (3). New Jersey courts consistently enforce such provisions. *See, e.g., Lawrence R. McCoy Co. Inc. v. S.S. Theomitor III*, 133 N.J.Super. 308, 336 A.2d 80, 85–86 (1975); *Upjohn Co. v. Timpany*, 168 N.J. Super. 283, 402 A.2d 979, 981–83 (1979); *World Products Inc. v. Central Freight Service Inc.*, 342 F.2d 290, 291 (3rd Cir. 1974) (New Jersey law applied). The district court found that while Hudson generally knew Geismar was going to resell the oil, Hudson was never informed of the resale customers' identity or the sale prices. In view of the language of Hudson's warehouse receipt limiting its liability under § 7–204(2), Hudson had no reason to anticipate that it might be held liable either for the tortious nature or the extent of damages sought by Geismar.

## V

Accordingly, the June 21, 1985 judgment of the district court dismissing Geismar's cause of action is affirmed. In view of that conclusion, we need not address the issues raised by Hudson's affirmative defenses or the question of damages.