746 A.2d 532

INDUSTRIAL RISK INSURANCE, AS SUBROGEE OF SEIKO CORPORATION OF AMERICA, PLAINTIFF–APPELLANT, v. UNITED PARCEL SERVICE, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued October 19, 1999—Decided March 7, 2000.

586

Before Judges WALLACE, Jr., and LESEMANN.

*Mark L. Antin,* argued the cause for appellant (*Gennet, Kall-mann, Antin & Robinson,* attorneys; *Mr. Antin* and *Francie E. Joseph,* on the brief).

*E. Evans Wohlforth,* argued the cause for respondent (*Gibbons, Del Deo, Dolan, Griffinger & Vecchione,* attorneys; *Mr. Wohl-forth,* on the brief).

The opinion of the court was delivered by

LESEMANN, J.A.D.

This case involves a theft, from Seiko Corporation of America (Seiko), of products which Seiko had loaded onto a United Parcel Service (UPS) owned trailer, for pickup and later delivery by UPS. The two companies had a longstanding relationship which included a pattern (sanctioned by federal law known as the Carmack Amendment to the Interstate Commerce Act, 49 *U.S.C.A.* § 14706) under which the shipping charges paid by Seiko were premised on a $100 per package limitation of UPS's liability for any loss or damage to Seiko's goods. The loss here occurred when thieves impersonated UPS employees and stole a loaded UPS trailer from Seiko's property. Seiko claimed that UPS had

caused the loss through its negligence, but that the loss limitation provision did not apply because the stolen goods had not yet been delivered to UPS when they were stolen.[1]

We agree with UPS's argument that the intent of the Carmack Amendment was to create one uniform rule of liability covering the entire body of services involved in transporting goods in interstate commerce; that the statute's applicability is not limited to the time when goods are actually in motion; that once Seiko had done all it was required to do (by loading the goods onto the UPS trailer), the goods were properly regarded as within the possession of UPS; and thus the liability limitation provision applied. We therefore affirm the trial court's grant of summary judgment in favor of UPS, dismissing plaintiff's attempt to recover damages in excess of the agreed upon liability limitation, and its denial of plaintiff's cross-motion for summary judgment in its favor.

There are no material issues of fact and thus resolution by summary judgment is appropriate. *Brill v. Guardian Life Ins. Co.*, 142 *N.J.* 520, 666 *A.2d* 146 (1995); *Judson v. Peoples Bank & Trust Co. of Westfield*, 17 *N.J.* 67, 110 *A.2d* 24 (1954). The undisputed facts are as follows:

Prior to the theft that led to this suit, UPS and Seiko had developed what plaintiff describes as "an ongoing business relationship and ... a customary course of dealing." That pattern included UPS providing Seiko with an empty trailer on a regular basis, with Seiko then loading its goods onto the trailer. Seiko would notify UPS when the trailer was loaded and UPS would then pick up the trailer and leave a new, empty trailer, so the process could be repeated.

---

[1] UPS paid Seiko $134,000 for the lost goods, computed at $100 per package plus some additional shipping and handling costs. The amount claimed by Seiko, based on the alleged full value of the goods, was $426,418. Seiko submitted a claim for the difference to its own insurance company, Industrial Risk Insurance, which paid Seiko and then instituted this suit as subrogee of the rights of Seiko.

UPS employees, driving a UPS tractor, would normally pick up the loaded trailer by attaching the tractor to the loaded UPS trailer. UPS had provided Seiko with a supply of shipping forms denominated "pickup record—UPS consignee billing" on which Seiko employees would enter the particulars of each shipment. When the UPS driver received the loaded trailer, the driver would sign the "pickup record", retain one copy and give one copy to Seiko. The "pickup record" included the following printed statement:

> Unless a greater value is declared in writing on this receipt, the shipper hereby declares and agrees that the released value of each package or article not enclosed in a package covered by this receipt is $100, which is a reasonable value under the circumstances surrounding the transportation.

One portion of the pickup record form included blank spaces where the shipper could designate any articles it might wish to exclude from the $100 liability limitation. That portion was headed by an instruction to, "List all declared valued packages at full declared value." Immediately under that statement were two columns, one designed for a description of particular goods, headed "Consignee Billing I.D. No.," and immediately next to it, a corresponding column entitled, "Declared Value." On the day with which we are concerned, Seiko listed no articles in those portions of the "pickup record" and did not declare any value in excess of $100.[2]

Because of inclement weather on December 19, 1995, Seiko telephoned UPS on that day and asked UPS to make its pickup in the early afternoon rather than at its customary time of 5:30 p.m. UPS agreed, and at approximately 12:30 p.m., two men dressed as UPS drivers and driving a UPS tractor arrived at Seiko's premises. They were apparently familiar with the normal procedures

---

[2] The parties are not specific on the point, but it seems there was seldom, if ever, a designation of any goods having a value in excess of $100. UPS notes it is not unusual for shippers to decline to specify any such additional value, which would entail higher shipping rates. It says that shippers often prefer to cover that risk through private, separate insurance, which Seiko apparently did here through plaintiff Industrial Risk Insurance.

between UPS and Seiko. They signed the normal pickup record which Seiko had prepared. They left the customary replacement trailer for Seiko and drove off with the loaded trailer. In fact, they were not UPS employees, but imposters who stole the contents of the trailer. The empty trailer was then abandoned and found by the authorities the next day.

There is no question that if the goods here had been removed from the Seiko premises by bonafide UPS employees in the normal way, and had thereafter been damaged or destroyed by UPS or its employees, the quoted provisions of the "pickup record" would limit UPS's liability to $100 per package. The issue is whether that normal rule applies in view of the device by which the thieves obtained the goods and the manner in which the theft was accomplished. We believe it does, and that neither the policy of the federal legislation nor the reasonable understandings of the parties would support a contrary conclusion.

I

Although sometimes cast in abstruse language, the rules governing carrier liability (at least as they apply here) are in reality quite simple.

The Carmack Amendment to the Interstate Commerce Act, 49 *U.S.C.A.* § 14706, established a national uniform policy governing the liability of interstate carriers for loss or damage to property entrusted to them. *A.T. Clayton & Co. v. Missouri–Kan.–Tex.R.R. Co.,* 901 *F.*2d 833, 834 (10th Cir.1990). State law inconsistent with the Carmack Amendment is, to that extent, preempted. *Hughes v. United Van Lines, Inc.,* 829 *F.*2d 1407, 1415 (7th Cir.1987), *cert. denied,* 485 *U.S.* 913, 108 *S.Ct.* 1068, 99 *L.Ed.*2d 248 (1988); *Arnell v. Mayflower Transit, Inc.,* 968 *F.Supp.* 521, 524 (D.Nev.1997). The Carmack Amendment regulates the entire shipping transaction, and a central purpose of the statute is to prevent discrimination and preferences by and between carriers and shippers and to insure uniform treatment of

shippers. *Upjohn Co. v. R.D. Timpany*, 168 *N.J.Super.* 283, 288, 402 *A.*2d 979 (App.Div.1979).

Under the Carmack Amendment, a shipper may recover from the common carrier to whom it entrusted its goods "without regard to the initial carrier's negligence." *See Conair Corp. v. Old Dominion Freight Line, Inc.,* 22 *F.*3d 529, 531 (3d Cir.1994) (citations omitted):

> To establish a *prima facie* case of liability under the Amendment, a shipper must prove the following three elements: (1) delivery of the goods to the initial carrier in good condition, (2) damage of the goods before delivery to their final destination, and (3) the amount of damages. After a plaintiff establishes a *prima facie* case of liability against the carrier, the carrier has the burden of proving that it was not negligent and that the loss was caused by an act of God, act of public enemy, act of shipper, act of public authority, or the inherent nature or vice of the goods.

*See also Upjohn Co. v. R.D. Timpany, supra,* 168 *N.J.Super.* at 287, 402 *A.*2d 979:

> The Carmack Amendment ... makes carriers liable "for the full actual loss, damage or injury ... caused by" them to property they transport, and declares unlawful and void any contract, regulation, tariff or other attempted means of limiting this liability.

\* \* \* \*

> Initiating carriers are liable for the full amount of any loss, regardless of whether it occurs on the routes of the initiating carrier, any connecting carrier or the delivering carrier. The shipper has the option of proceeding against either the initiating or delivering carrier.

*See also Jackson v. Brook Ledge, Inc.,* 991 *F.Supp.* 640, 644 (E.D.Ky.1997).

The Carmack Amendment, however, offers the carrier a method by which it may (with the consent of the shipper) limit its liability. It may advise the shipper of an option by which the latter may either set forth the actual value of goods being shipped, and thereby insure that it will be paid that actual value if the goods are lost or destroyed; or, alternatively, the shipper may accept a "declared," or "released," value for articles delivered to the carrier, and in that event recovery for loss or damage will be limited to that "released" or "declared" value. Provided that the

carrier has made the choice clear to the shipper, the carrier may differentiate in the rates charged under the two disparate methods of charging: It may charge a lower rate for goods with the "released value" designated by the carrier, and a higher rate for goods whose actual value is set out by the shipper. *See American Ry. Express Co. v. Lindenburg*, 260 *U.S.* 584, 592, 43 *S.Ct.* 206, 209, 67 *L.Ed.* 414 (1923); *Boeing Co. v. U.S.A.C. Transp., Inc.*, 539 *F.*2d 1228, 1231 (9th Cir.1976).

That is precisely what the parties did here. Consistent with their "ongoing business relationship" and "customary course of dealing," Seiko accepted UPS's "released value" of $100 per package, did not set out a higher value for any package, and paid a commensurate lower shipping rate to UPS. The option to select either the greater protection at a higher charge, or a $100 loss limitation at a lower charge, was clearly set out in the shipping documents prepared by UPS and furnished to Seiko and in UPS's tariff.[3] There is no question that both parties understood the option, and that, as it customarily did, Seiko chose the less expensive option. Plaintiff does not deny that indisputable proposition.

█ Plaintiff impliedly acknowledges that if the men who drove away with the UPS tractor (loaded with Seiko's goods) were actual UPS employees, who legitimately obtained possession of the goods

---

[3] The UPS tariff is an 18 page document which includes a section entitled "DAMAGED AND LOST PROPERTY," containing the following provision:

> Whenever property is damaged or lost by the carrier in the course of transportation, the carrier [unless it opts to repair the goods] ... will pay ... for the damaged or lost goods, not to exceed the actual or declared value [*i.e.*, $100 per package] of the property, whichever is lower....

The section entitled "METHOD OF DETERMINING RATES" refers to a schedule of rates itemized in another section of the tariff, (entitled "RATES"), but then specifies that those rates, "are applicable only when the value of the property" has been "released to a value not exceeding $100 per package...." For articles released to "a value exceeding $100 per package," the rates are those set out in the "RATES" section, plus an additional described charge based on the actual value of the goods.

and then stole them, UPS's liability for such loss would be limited to $100 per package. It claims, however, that because the theft occurred in the way that it did, the limited liability provisions do not apply, the Carmack Amendment is inapplicable, and UPS is liable under common law negligence principles for the full value of the goods taken. We reject the argument.

If the Carmack Amendment and its limited liability option applied only while goods being shipped were actually in motion, on the highway, plaintiff's argument might have merit. However, it is well established that the Carmack Amendment and its provisions do not begin or end at any such arbitrary point. They cover the entire relationship between carrier and shipper, and "the entire body of ... services" which are provided "in the course of transportation" of goods by the carrier. *See Cleveland C., C. & St. L. Ry. Co. v. Dettlebach,* 239 *U.S.* 588, 591, 594, 36 *S.Ct.* 177, 179–80, 60 *L.Ed.* 453 (1916). Case law has dealt with carrier responsibility on both ends of the actual movement of goods and with respect to "pre-movement" activities, has made clear that carrier responsibility generally attaches at the point when there are no further acts to be performed by the shipper and all that remains is for the carrier to begin actual movement. *See Conair Corp. v. Old Dominion Freight Line, Inc.,* 22 *F.*3d 529 (3d Cir.1994); *Mattel, Inc. v. Interstate Contract Carrier Corp.,* 722 *F.*2d 17 (2d Cir. 1983).

The facts of the *Conair* and *Mattel* cases are strikingly similar to those here. In *Mattel,* pursuant to the parties' long term relationship and their contract, employees of Mattel, the shipper, and Interstate, the carrier, loaded goods produced by Mattel into a trailer owned by Interstate. The trailer then "remained on Mattel's premises awaiting arrival of a tractor, but an imposter tractor operator showed up, picked up the trailer, signed the bill of lading which had been left with the security guard at the gate, and took the trailer in tow." *Mattel, supra,* 722 *F.*2d at 18. The court held that at the time of the theft,

> There was no further action that Mattel was to take to bring about transportation. The only action left was to be taken by the carrier, who had to arrange for ... [its] independent tractor operator to call for the trailer and haul it away. As nothing was left to be done by the shipper, the trailer remained on the shipper's premises merely as an accommodation for the carrier.
>
> It is not the location of the goods which is controlling in such circumstances, but rather who it is that has actual or constructive possession of the goods. In this case the responsibility of the carrier attached when the loading was completed and the bill of lading signed.

> [*Id.* at 19.]

The facts of *Conair* are similar. There, as in *Mattel* and the present case, the shipper's employees loaded a trailer owned by the carrier, Old Dominion. When the loading had been completed, an Old Dominion driver signed a bill of lading, but then left the goods at the Conair facility to await another Old Dominion driver who was to remove the trailer and transport it to its destination. By the time that second driver arrived, the trailer had been stolen and the goods were never recovered. Applying essentially the same reasoning employed in *Mattel,* the Third Circuit found that the Carmack Amendment did apply, and it rejected an argument that the goods had never left the possession of the shipper:

> It is undisputed that Old Dominion's trailer was completely loaded and prepared for transportation at the time Jolacoeur [the first Old Dominion employee] signed the bills of lading, evidencing receipt of the trailer by Old Dominion. Upon loading the goods into Old Dominion's trailer and signing the bills of lading, there was no further action required by Conair before transportation of the shipment by Old Dominion. At that point, Conair released the trailer to Old Dominion for immediate transportation and Old Dominion had complete and exclusive control of the goods. ... Old Dominion thus has constructive, if not actual, receipt and possession of the shipment at the time of the theft.

> [*Conair, supra,* 22 *F.*3d at 532.]

*See also W.H. & C.B. Hodges v. Louisiana Ry. & Nav. Co.,* 180 *La.* 3, 156 *So.* 26, 28 (1934) (indicating that liability and responsibility attached to the carrier when there was nothing further to be done by the shipper); *Louisville & N.R. Co. v. Edwards' Admin'x.,* 183 *Ky.* 555, 209 *S.W.* 519, 520 (Ky.1919); and *see* Saul Sorkin, *Goods in Transit* § 2.28 [No. 1]:

> [W]here there is nothing left to be done by the shipper and a loaded trailer remains at the shipper's premises for the convenience of or as an accommodation for the carrier, the liability of the carrier commences.[4]

That reasoning applies here. The Seiko goods had been loaded into the UPS trailer. Once that had been accomplished, there was nothing more for Seiko to do. What remained was for UPS to perform its function: to attach its tractor to its trailer and remove the goods. Constructive possession, if not actual possession, had passed to UPS and under the holdings of *Mattel* and *Conair*, as well as rational application of the Carmack Amendment principles, responsibility had passed to UPS.

## II

As noted above, an important function of the Carmack Amendment is to insure uniform non-discriminatory treatment respecting interstate carriers, their rights and their responsibilities. To accomplish that, the statute embodies an overall cohesive and rational set of rules. The carrier is initially burdened with virtually all-encompassing liability. However, with the concurrence of the shipper, the carrier may ameliorate that possible exposure, at the same time the shipper saves on its shipping expense. The method of accomplishing that is spelled out in the statute. The critical element is a clearly expressed option given by the carrier and a clear exercise of that option by the shipper.

UPS claims that plaintiff's argument would create a "carve out" from this "federally controlled relationship," foster irrational results, and undercut the congressional purpose. We agree. Plaintiff's thesis is imaginative but ignores the statute's policy. It

---

[4] For application of the same principle at the other end of the shipment—after the goods have been brought to their destination but while the carrier still has responsibility for them—*see, e.g., Upjohn Co. v. R.D. Timpany, supra,* 168 *N.J.Super.* at 288, 402 A.2d 979 (holding that goods remained covered by the Carmack Amendment after arrival in railroad's terminal facility and while awaiting trans-shipping to ultimate customer).

would produce different results depending on factors which are extraneous to that policy.

Thus, there is no rational basis why the exposure of UPS should vary depending upon whether it's trailer was stolen while it was inside Seiko's gate or after it departed through that gate. Here, the theft was apparently effected by third parties posing as UPS employees. We can see no basis for requiring UPS to pay more because the theft was effected in that way, than if it had been effected by those same criminals hijacking the Seiko goods after UPS had obtained possession thereof; or, if it had been affected by actual UPS employees who legitimately obtained possession of the goods and then ran off with them.

Further, it seems almost inevitable that the adoption of one such "carve out" here, will invite similar reasoning and similar "carve outs" in other cases. The evisceration of the congressional policy of uniformity may well follow.

Nor is there any equitable basis to afford plaintiff the relief it seeks. Seiko is an experienced commercial shipper. It made an express bargain and it received precisely what it bargained for. The present suit by its insurer—not even by Seiko—attempts now to obtain a benefit for which Seiko expressly declined to pay when it dealt with UPS. And conversely, that claim would deprive UPS of the limited liability for which it bargained when it agreed to charge Seiko the lower of its two tariff prices.

As noted above, Seiko acknowledges its longstanding relationship with UPS and its customary method of shipping under UPS's lower tariff rate. It knew precisely what options were available to it, and it deliberately selected a cheaper shipping rate with a commensurate loss limitation. Again we note the undisputed observation by UPS that many shippers make such a choice, and opt to obtain other protection via their own insurers, as Seiko apparently did here with plaintiff Industrial Risk Insurance. That choice presumably made good financial sense to Seiko. However, the present attempt of its insurer to obtain precisely those benefits for which Seiko declined to pay cannot be justified. Under the

language of the Carmack Amendment, the UPS tariff, the shipping agreements between the parties, the policy of the federal law and basic concepts of fairness and justice, plaintiff's claim must be rejected.

## III

Plaintiff points to the fact that the bill of lading here was signed by an imposter rather than a bona fide UPS employee and claims that forgery represents a fatal non-compliance with the Carmack Amendment. We regard that factor as precisely the kind of formal, non-substantive distinction on which carrier liability should *not* turn under the Carmack Amendment or under any rational resolution of the rights and obligations of the parties.

In support of its argument, plaintiff cites *Hughes v. United Van Lines, Inc., supra,* 829 *F.*2d at 1415:

> There are four steps a carrier must take to limit its liability under the Carmack Amendment: (1) maintain a tariff within the prescribed guidelines of the Interstate Commerce Commission; (2) obtain the shipper's agreement as to his choice of liability; (3) give the shipper a reasonable opportunity to choose between two or more levels of liability; and (4) issue a receipt or bill of lading prior to movement.

The relevant factor here is the fourth of those enumerated steps; the first three have been dealt with above and require no further discussion.

As concerns the issuance of a "receipt or bill of lading", UPS correctly notes that the *Hughes* statement constitutes a gloss on the statutory language, since the Carmack Amendment itself does not refer to the issuance of any such "receipt or bill of lading." It says only that the provision limiting the carrier's liability must be set out in a "written or electronic declaration of the shipper" or by a "written agreement between the carrier and the shipper." Here, there clearly was a written declaration of the shipper. The receipt form provided by UPS contained the declaration authorized by the Carmack Amendment, limiting UPS's liability unless Seiko specified otherwise. Seiko not only did not specify otherwise, but it signed the receipt and placed its goods into the UPS

trailer in full recognition of the limited liability to which it thereby agreed.

However, even accepting that a "receipt or bill of lading" had to be issued by UPS to effect its liability limitation, we are satisfied that the statutory requirement was met.

A bill of lading such as that involved here could serve either (or both) of two functions; first, it could set out the terms under which the shipper was delivering and the carrier was receiving the shipper's goods; and, second, it could serve as evidence of the carrier's receipt of goods. *Accura Sys., Inc. v. Watkins Motor Lines, Inc.*, 98 *F*.3d 874, 878 (5th Cir.1996); *Knapp v. Minneapolis, St. P. & S.S.M. Ry. Co.*, 34 *N.D.* 466, 159 *N.W.* 81, 86 (1916); *Hohenberg Bros. v. Missouri Pac. R.R. Co.*, 586 *S.W.*2d 117, 121 (Tenn.App.1979). Here, the bill of lading served that first function by clearly and unequivocally setting out the terms governing the delivery of goods. And there was no need for the second function because there was no dispute as to what happened. The goods were loaded onto UPS's trailer. No one disputes that, and there is no need to "prove" it. The issue is the significance of that delivery—not whether it took place. The presence or absence of a signature on a bill of lading, or the genuineness of the signature that does appear, adds nothing to the case, one way or the other.

Further, the Carmack Amendment, 49 *U.S.C.A.* § 14706(A)(1), expressly states that,

Failure to issue a receipt or bill of lading does not affect the liability of a carrier.

And *see Harrah v. Minnesota Mining & Mfg. Co.*, 809 *F.Supp.* 313, 319 (D.N.J.1992) (holding that "possession of a bill of lading is not determinative of a plaintiff's rights or status under the Carmack Amendment"). There is no reason why that disclaimer should not be given precisely the effect that its words express.

In short, that the bill of lading here was signed by an imposter rather than an actual UPS employee is immaterial. The document forms had been prepared and supplied by UPS. They had been

completed by Seiko and signed by Seiko. Seiko's job, at that point, was completed. The goods had been placed in the UPS trailer, UPS had been advised they were there, and UPS had agreed to retrieve them. Those facts are functionally indistinguishable from those in *Mattel* and *Conair*. To reach a different conclusion here because the document completed and signed by Seiko was now being countersigned by an imposter rather than an actual UPS driver, would elevate form over substance and cause this case to turn on irrational distinctions rather than sound policy. Only if some controlling statute or judicial decision required such a result, would this court be led to such a conclusion. In fact, as noted, both statute and case law reject such an irrational distinction and make clear that the case should not turn on such an extraneous factor.

Thus, assuming there is a statutory requirement for issuance of a bill of lading, we are satisfied that UPS's providing Seiko with the forms that UPS had prepared, and Seiko's completing and signing those forms complied with any such assumed requirement. To hold otherwise, and find that Seiko should receive the benefit of unlimited liability against UPS (although Seiko expressly declined to pay for such coverage), and to impose such liability on UPS (although it was being paid at a rate which insured that it would not face such liability), would subvert the language and the policy of the Carmack Amendment and would do precisely what we noted under Point II above should not be done: insure that significant rights and liabilities would turn on insignificant and meaningless distinctions, without any justification based on any realistic concepts of policy or fairness.

The sound decision of Judge Miniman granting summary judgment to defendant is affirmed.