CARGILL, INC., Plaintiff–Appellee,

v.

BOAG COLD STORAGE WAREHOUSE, INC., Defendant–Appellant.

No. 93–2547.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 3, 1995.

Decided Dec. 6, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied Feb. 1, 1996.

---

Stuart H. Teger (argued and briefed), Honigman, Miller, Schwartz & Cohn, Detroit, MI, for Plaintiff–Appellee.

David Berkal, Morrison, Mahoney & Miller, Southfield, MI, John F. Horvath (argued and briefed), Susan L. Troxell (briefed), Horvath & Lieber, Chicago, IL, for Defendant–Appellant.

* The Honorable Robert Holmes Bell, United States District Judge for the Western District of Michigan, sitting by designation.

Before: NELSON and NORRIS, Circuit Judges; BELL, District Judge.*

DAVID A. NELSON, Circuit Judge.

This is an appeal from a judgment entered on a verdict for the plaintiff in a diversity action governed by Michigan law.

The action was brought by the producer of a premium brand of frozen turkeys. Two grocery distributors that had purchased turkeys of this brand from the plaintiff arranged to have the birds stored at a warehouse operated by the defendant. After allegedly allowing some of the turkeys to thaw, and without telling anyone what had happened, the warehouse company was said to have refrozen the birds and released them for sale to the public. The turkeys had become spoiled, it turned out, and a costly recall of the product ensued. The producer, which bore the cost of the recall and claimed a significant loss of business, sued the warehouse company for negligence.

The threshold question that we are asked to decide is whether the warehouse operator, with which only the grocery distributors had entered into contracts, owed a duty of care to the producer that owned the brand name in question. If we conclude that Michigan courts would recognize such a duty, we must decide whether the plaintiff's claim is barred either by Michigan's "economic loss doctrine" or by § 2–722 of the Uniform Commercial Code (Mich. Comp. Laws 440.2722). We must further decide whether the plaintiff is subject to limitation-of-damages provisions that were contained in warehouse receipts issued to the distributors; whether the district court should have directed a verdict for the defendant because of an alleged failure of proof on the issue of negligence; whether the amount awarded by the jury as damages so exceeded the damages proved at trial that a new trial should have been granted on this issue; and whether the defendant is entitled to a new trial because of the admission of an exhibit asserted to constitute impermissible hearsay.

Resolving each of these questions in favor of the plaintiff, we shall affirm the judgment.

## I

The plaintiff, Cargill, Inc., grows and processes turkeys that are distributed under various brand names. Cargill employs the name "Honeysuckle White" for its top line.

The defendant, Boag Cold Storage Warehouse, Inc., operates a warehouse facility in Detroit, Michigan. Two of Cargill's biggest customers in Detroit—Borman's, Inc., and Foodland Distributors—used the Boag warehouse to store Honeysuckle White turkeys purchased from Cargill. Although Cargill had no contractual relationship with Boag, Cargill was instructed to ship the turkeys to Boag for storage until the customer needed them. The birds would then be trucked to a distribution center for transshipment to retail stores.

A week before Thanksgiving Day in 1991, two retail purchasers of 12–14 pound Honeysuckle White brand turkeys complained that the birds smelled bad. The purchases were made at stores serviced by Foodland. All of the 12–14 pound Honeysuckle White turkeys from these stores were then returned to Foodland's distribution center. Cargill promptly confirmed widespread spoilage among turkeys at the distribution center, and Cargill's quality assurance director attributed the problem to the birds' having been thawed and refrozen.

Cargill's records showed that the turkeys in question had been sold not to Foodland, but to Borman. It was at Borman's direction that Cargill had shipped these particular birds to Boag in mid-May of 1991. Boag ultimately released Borman's birds to Foodland by mistake, it appears.

Upon further investigation, Cargill personnel found several cases of spoiled turkeys at a store supplied by Borman. These turkeys, released to the correct buyer, had the same production codes as the spoiled turkeys found at Foodland.

Boag's records indicated that all the turkeys with suspect production codes had either been released to Borman or were still in the warehouse. Upon a search of the ware-house, however, Cargill found no turkeys with these production codes. None of the turkeys remaining at the warehouse were spoiled. Because Cargill could not be certain where all the turkeys from code-groups containing spoiled birds had gone, it was forced to issue a general recall throughout the Detroit area for all Honeysuckle White turkeys in the 12–14 pound category.

The publicity attendant upon the recall had an adverse effect on retail sales of the categories of Honeysuckle White turkeys that remained in stores. Because it was just before Thanksgiving, retailers had large inventories. Cargill took back the excess inventory, repackaged some of the birds as Grade A rather than premium, and sold them in other markets. Sales of Honeysuckle White turkeys in the Detroit area remained depressed long after the 1991 Thanksgiving season, according to Cargill.

In January of 1992 Cargill brought suit against Boag in the United States District Court for the Eastern District of Michigan. The claim set forth in the complaint sounded in tort, not contract. Some months after it filed the complaint, Cargill came to terms with the distributors on the handling of costs connected with the recall. In this connection Cargill took, or became entitled to take, assignments of "all claims and causes of action that [Foodland or Borman] may have against any third party in connection with the Turkey Recall, including, without limitation, any claim it may have against Boag Cold Storage Warehouse, Inc." Notwithstanding the assignments, Cargill never amended its complaint to assert a derivative claim as assignee.

At different times during the course of the proceedings Boag moved to dismiss the complaint for failure to state a claim of negligence; to strike the tort claim because Cargill had relinquished its interest in the turkeys; and to limit Cargill's recovery in accordance with limitation-of-damages provisions in the warehouse receipts that Boag had issued to Foodland and Borman. The district court (Zatkoff, J.) denied each of these motions and also denied motions for judgment at the time of trial. The jury ultimate-

ly returned a verdict for Cargill in the principal sum of $820,980.96. The court entered judgment on the verdict, denying requests for judgment *n.o.v.* and for a new trial, and this appeal followed.

## II

■ Although Cargill was a stranger to the contracts under which Boag became a bailee of the frozen turkeys, this circumstance would not necessarily preclude Michigan courts from concluding that Boag owed Cargill a duty to exercise care in performing its contractual responsibilities. See *Clark v. Dalman,* 379 Mich. 251, 150 N.W.2d 755 (1967), where it was held that a stranger to a contract for the repair of a water tank could go to the jury on a claim that he had been injured because of the repairman's negligent failure to comply with one of the provisions of the contract; *Williams v. Polgar,* 391 Mich. 6, 215 N.W.2d 149 (1974), where a title abstractor's negligence in performing a contract with a landowner was held to give rise to a tort action on the part of the landowner's grantee; and *Crews v. General Motors Corp.,* 400 Mich. 208, 253 N.W.2d 617 (1977), where the breach of a manufacturer's contractual obligation to make reasonable repairs was held to give rise to a tort action on the part of an injured employee of a purchaser of the manufacturer's product. As the Michigan Court of Appeals declared in *National Sand, Inc. v. Nagle Construction, Inc.,* 182 Mich. App. 327, 331, 451 N.W.2d 618, 620 (1990), "a plaintiff may maintain an action *in tort* where he is injured by the defendant's negligent performance of contract even where there is no privity between the parties." (Emphasis in original.)

Although Michigan courts have cited a number of different factors that may give rise to a duty on the part of a contracting party toward a stranger to the contract, the factor that probably proves decisive more often than any other is the foreseeability of harm to the plaintiff if the contract is not executed with due care. See, *e.g., Roberts v. Pinkins,* 171 Mich.App. 648, 430 N.W.2d 808 (1988), where a defendant's failure to prevent the abandonment of a building he had allegedly contracted to "care for and manage"

was held not to give rise to a cause of action on the part of a woman who was forced into the abandoned building at gunpoint and criminally assaulted there. "[W]e do not believe," said the court of appeals, "that use of the building by the plaintiff's attacker was foreseeable under the instant circumstances." 171 Mich.App. at 654, 430 N.W.2d at 811. In cases such as *Clark v. Dalman, Williams v. Polgar,* and *Crews v. General Motors Corp.,* by contrast, "recovery was permitted ... by those whose relationship to the action taken under the contract *was* reasonably foreseeable." *Commercial Union Ins. Co. v. Medical Protective Co.,* 426 Mich. 109, 124 n. 5, 393 N.W.2d 479, 485 n. 5 (1986) (emphasis supplied).

■ Cargill argues persuasively that when Boag allowed the thawed and refrozen turkeys to continue in the stream of commerce, it was readily foreseeable that the brand name affixed to the product would suffer, the manufacturer's reputation would be damaged, and the manufacturer would have to take steps to mitigate the damage. And Cargill was readily identifiable as a person likely to be injured, Boag having received turkeys bearing the Honeysuckle White brand directly from Cargill. Because Boag had "knowledge or special reason to know of the consequences of [the] tortious conduct in terms of the persons likely to be victimized and the nature of the damages likely to be suffered," Boag was under a duty not to interfere with Cargill's economic well-being. *People Express Airlines, Inc. v. Consolidated Rail Corp.,* 100 N.J. 246, 262, 495 A.2d 107, 115 (1985), citing W. Prosser, The Law of Torts § 129, at 941 (4th ed.1971), for the proposition that specifically foreseeable plaintiffs can recover for negligent interference with economic expectation notwithstanding the absence of any physical injury.

■ Even when it is foreseeable that a particular non-party will be harmed by negligent performance of a contract, however, foreseeability can occasionally be trumped by special circumstances. See *Friedman v. Dozorc,* 412 Mich. 1, 312 N.W.2d 585 (1981), where lawyers who had brought an unsuccessful medical malpractice action against a physician were sued by the physician for,

among other things, failing to conduct a reasonable investigation into the merits of their client's claim before the commencement of litigation. Assuming that the lawyers owed their client a duty to conduct such an investigation, the Michigan Supreme Court decided, it would be "inconsistent with basic precepts of the adversary system" to hold that a corresponding duty was owed to the client's adversary. 412 Mich. at 23, 312 N.W.2d at 591. "[C]reation of a duty in favor of an adversary of the attorney's client," said the Court, "would create an unacceptable conflict of interest that would seriously hamper an attorney's effectiveness as counsel for his client." 412 Mich. at 24, 312 N.W.2d at 591–92 (footnote omitted).

No such obvious conflict of interest exists in the case at bar. Boag argues, however, that Borman and Foodland had an economic interest in minimizing storage costs—an interest that would suffer if the warehouseman were to be exposed to unlimited liability to the Cargills of the world. Such exposure would lead to higher storage charges, Boag suggests, and might force the warehouseman out of business.

■ The argument is an interesting one, but we have seen little or nothing in the Michigan case law to suggest that the Michigan courts would find it persuasive. The argument would seem less than compelling in a case such as this one, at least, where the warehouseman appears to have been guilty of misfeasance as opposed to mere nonfeasance. (See *Hart v. Ludwig,* 347 Mich. 559, 79 N.W.2d 895 (1956), for an elucidation of this distinction.[1])

There would have been no significant exposure to Cargill at all, moreover, if Boag had made a clean breast of things, so to speak, upon discovering that the turkeys had thawed. By quietly refreezing the birds and releasing them for distribution to an unsus-

pecting public, Boag was gambling not only with the health of the people by whom the birds might be eaten, but with the integrity of Cargill's brand name. The gamble having been lost, it does not seem unreasonable that the gambler should have to pay the consequences.

## III

■ Where a claim for damages arises out of the commercial sale of goods, and the losses incurred are purely economic, the "economic loss doctrine" bars tort recovery and limits the plaintiff's remedies to those available under the Uniform Commercial Code. *Neibarger v. Universal Cooperatives, Inc.,* 439 Mich. 512, 515, 486 N.W.2d 612, 613 (1992); *Detroit Edison Co. v. NABCO, Inc.,* 35 F.3d 236, 239 (6th Cir.1994). In other words, "[w]here a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone...." *Neibarger,* 439 Mich. at 520, 486 N.W.2d at 615 (internal quotes and citations omitted).

■ Judge Zatkoff concluded that the economic loss doctrine does not limit the plaintiff's right to recover its damages here, because Michigan courts apply the doctrine only in situations involving the sale of goods. We agree. The doctrine is associated with "transactions in goods," see Mich. Comp. Laws 440.2102, and not with transactions in services. See *Neibarger,* 439 Mich. at 533–534, 486 N.W.2d at 621.

■ The case at bar is not a suit against a manufacturer that sold defective goods; it is a suit by a manufacturer against a provider of services (frozen food warehousing) that rendered the manufacturer's products defective and thereby injured the reputation of similarly branded products that were not defective. It was wholly predictable that the

---

1. "Misfeasance is negligence during performance of a contract. While performing a contract, a party owes a separate, general duty to perform with due care so as not to injure another." *Courtright v. Design Irrigation, Inc.,* 210 Mich.App. 528, 530, 534 N.W.2d 181, 182 (1995) (citation omitted).

This "separate, general duty" not to injure another can extend, as it did in *Courtright,* to one

who is not a party to the contract. The duty "not only arises out of a contractual relationship, but is also arises by operation of law, a general duty owed by defendant to the public of which plaintiff is a part." *Osman v. Summer Green Lawn Care, Inc.,* 209 Mich.App. 703, 710, 532 N.W.2d 186, 190 (1995), citing *Clark v. Dalman,* 379 Mich. at 260–61, 150 N.W.2d at 759–760.

consuming public would associate the spoilage with Cargill's "Honeysuckle White" brand, while remaining ignorant of Boag's very existence. Peculiarly vulnerable to the tortious injury that occurred here, Cargill was powerless to prevent it. We know of no Michigan precedent that would bar redress for the tort in a situation of this type.

■ The public policy favoring mitigation of damages also favors the allowance of a remedy in tort here. Neither party denies that spoiled turkeys have the potential to cause health problems. The economic loss doctrine does not apply where there is injury or death. *Neibarger,* 439 Mich. at 520, 486 N.W.2d at 615. Had Cargill taken no action, and had it been sued by a consumer who became ill from eating tainted turkey, there is no question that Cargill could have cross-claimed against Boag. It does not make sense to conclude that a party can wait until someone is physically injured and then invoke tort law to be made whole, while the same party, invoking the same theory, cannot be made whole for steps it takes to prevent such injuries in the first place.

## IV

■ Before the Uniform Commercial Code came into effect across the country, standing to sue for damage to goods was limited, in many jurisdictions, to the holder of title to the goods. Thus if goods that had been "identified to" a contract of sale were damaged by a stranger to the sale, such as a bailee, the buyer had no standing to sue the third party if title had not passed from the seller by the time of the injury.

■ U.C.C. § 2–722 was designed to liberalize the standing-to-sue rules. The primary purpose of § 2–722 was to let buyers sue third parties for physical damage to identified goods. See *Mitsui & Co. v. Hudson Tank Terminals Corp.,* 790 F.2d 226, 231 (2d Cir.1986); *In re Quality Processing, Inc.,* 9 F.3d 1360, 1364–65 (8th Cir.1993). Section

2–722 (adopted in Michigan as Mich. Comp. Laws 440.2722) provides in part that "[w]here a third party so deals with goods which have been identified to a contract for sale as to cause actionable injury to a party to that contract," then (a) "either party to the contract for sale who has ... a special property or an insurable interest in the goods" may sue the third party; [2] (b) "if at the time of the injury the party plaintiff did not bear the risk of loss as against the other party to the contract for sale and there is no arrangement between them for disposition of the recovery, his suit or settlement is, subject to his own interest, as a fiduciary to the other party to the contract;" and (c) "either party may with the consent of the other sue for the benefit of whom it may concern."

Cargill did not sue under U.C.C. § 2–722, of course, and probably could not have done so; it seems to be undisputed that, as Boag's brief says, Cargill "did not have title to the turkeys, nor possess any security interest [or] insurable or special property interest in the turkeys at the time they spoiled." Boag appears to think that Cargill might have been able to sue under § 2–722(b), but only as a fiduciary for the buyer. And Boag suggests that any tort action Cargill might otherwise have had was preempted by Michigan's adoption of § 2–722.

We find no preemption here. If Cargill's sale of the turkeys to Borman was completed before the tort was committed, it is far from clear that § 2–722 could have any application at all. In any event, § 2–722 was intended to liberalize the rules of standing, not foreclose otherwise viable actions in tort. See *Quality Processing,* 9 F.3d at 1364–65, holding that § 2–722 did not preempt an action for the common law tort of interference with contract.

We see nothing to the contrary in *Mitsui,* where the Court of Appeals for the Second Circuit held that although § 2–722(a) gave both buyer and seller standing to sue a bailee

---

**2.** The full text of Mich. Comp. Laws 440.2722(a) is as follows:

"a right of action against the third party is in either party to the contract for sale who has title to or a security interest or a special property or an insurable interest in the goods; and

if the goods have been destroyed or converted a right of action is also in the party who either bore the risk of loss under the contract for sale or has since the injury assumed that risk as against the other."

for damage to some 200 tons of tung oil that became contaminated through the bailee's negligence, there could not be a double recovery for the same loss. 790 F.2d at 231. There has been no double recovery in the case at bar.

## V

The buyer of the tung oil in *Mitsui* was not the bailor. The party that had entered into the bailment contract in that case was the seller, and the seller took a warehouse receipt containing a limitation of liability provision. The seller subsequently directed the bailee to release the oil to the buyer, thereby conferring on the buyer rights that were characterized by the court as "indistinguishable from a warehouse receipt." *Mitsui,* 790 F.2d at 233. The court declined to let the buyer seek damages for breach of a duty beyond that owed to the seller-bailor, and Boag contends that any recovery by Cargill in the case at bar should likewise be capped by the limitation-of-liability provisions in the warehouse receipts issued to Borman.

In *Mitsui,* however, the bailee "had no reason to anticipate that it might be held liable either for the tortious nature or the extent of damages sought by [the buyer]." *Id.* at 234. The bailee was never informed of the terms on which the buyer would resell the oil or the identity of the buyer's customers, and the buyer "was not in the class of foreseeable plaintiffs to whom [the bailee] owed a duty of care beyond the obligation assumed in the warehouse receipt." *Id.*

In the case at bar, by contrast, Cargill was an eminently foreseeable plaintiff. Cargill's identity was known to Boag, as was the fact that the turkeys were destined for retail sale under Cargill's brand name. In allowing the compromised turkeys to leave the warehouse without notice to anyone that they had been thawed and refrozen, Boag was doing something it had every reason to know could result in extensive injury to Cargill.

Cargill was not a party to the contracts in which Boag limited its liability to the bailors, and Cargill has never stood in the bailors' shoes as far as this litigation is concerned. Once it took assignments from the bailors, Cargill would have had a right to step into their shoes and sue as an assignee—but Cargill chose not to exercise that right, and we know of no legal principle requiring it to do so.

We are not unmindful of the policy considerations underlying U.C.C. § 7–204(2) (Mich. Comp. Laws 440.7204(2)), which authorizes the inclusion in warehouse receipts of contract terms limiting liability in case of loss or damage. But equally strong policy considerations inform the common law rules under which Boag became liable to Cargill in tort by virtue of the release for distribution to the public of tainted food products that bore Cargill's brand name. As a stranger to Boag's contracts with Borman, Cargill was not subject to the terms of the contracts. Boag could not impose contractual limits on *Cargill*'s right to redress by inserting provisions to that effect in a contract with *Borman.* (Or in a contract with Foodland, for that matter.)

Unlike the situation presented in *Mitsui,* where the seller was the bailor and was thus in a position to obtain favorable storage rates in exchange for accepting a limitation on the bailee's liability, the situation here is one where the seller (Cargill) was in no position to obtain monetary concessions from the bailee. The buyer in *Mitsui* was not in such a position either, to be sure, but if the goods he was purchasing proved, upon their release from the warehouse, not to be in conformity with the contract of sale, the buyer could seek redress from the seller.[3] Cargill had no corresponding right to seek redress from Borman—and as long as Cargill was a clearly foreseeable victim of the bailee's misfeasance, it makes sense to hold, as we do, that Cargill could seek full redress from the bailee.

---

**3.** The buyer in *Mitsui* did in fact go to arbitration with the seller. For reasons that do not appear to be relevant here, however, the arbitrators declined to award damages. See *Mitsui,* 790 F.2d at 228.

## VI

Boag contends that it was entitled to a directed verdict and to judgment *n.o.v.* because the proofs at trial were insufficient to support a finding that Boag was negligent. Like the district court, we find this contention unpersuasive.

The record contains evidence to show the following:

— that the turkeys were wholesome and frozen solid when they left Cargill's plant;

— that they could not have thawed and been refrozen en route to the warehouse;

— that the warehouse was poorly maintained, and its recordkeeping system was inadequate;

— that the turkeys were under Boag's exclusive control from the time they arrived at the warehouse until they were shipped out for distribution to retailers;

— that most frozen product is delivered to stores within 24 hours of its release from Boag's warehouse, and it takes four to six days for a turkey to thaw out completely;

— that soft Honeysuckle White turkeys were discovered on Boag's loading dock;

— that turkeys purchased by Borman were mixed up at the warehouse so that many of them were released to Foodland by mistake;

— that spoiled turkeys with the same production codes were found in the distribution chains of both purchasers within the same time frame;

— that the birds had been thawed and refrozen;

— that never before had substantial numbers of spoiled Honeysuckle White turkeys been found at the retail level;

— and that turkeys with the same production codes as those of the birds that spoiled had been shipped to other customers, and Cargill received no complaints about turkeys that had not been stored at Boag's warehouse.

On these facts, and under the law of Michigan, we think it was permissible for a jury to infer that turkeys consigned to Boag's warehouse had been allowed to thaw there and had been refrozen. Boag presented some countervailing evidence, but the jury was not required to accept it. On the record as a whole, we believe that it was well within the province of the jury to conclude that the preponderance of the evidence supported the scenario suggested by Cargill.

Although the Michigan Supreme Court has not always been comfortable with the Latin phrase *"res ipsa loquitur,"* the court now acknowledges that the concept evoked by this phrase has long been accepted in Michigan. *Jones v. Porretta,* 428 Mich. 132, 150, 405 N.W.2d 863, 872 (1987). In a decision handed down almost 30 years ago, the court explained the doctrine as follows:

"The doctrine of res ipsa loquitur is generally held to involve some or all of the following conditions:

1. The event must be of a kind which ordinarily does not occur in the absence of someone's negligence.

2. The event must have been caused by an agency or instrumentality within the exclusive control of the plaintiff.

3. The event must not have been due to any valuntary [*sic*] action or contribution on the part of the plaintiff.

4. Evidence of the true explanation of the event must be more readily accessible to the defendant than to the plaintiff." *Gadde v. Michigan Consolidated Gas Co.,* 377 Mich. 117, 124, 139 N.W.2d 722, 726 (1966).

According to the Restatement of Torts 2d, § 328D, p. 156, as the Supreme Court noted in *Jones v. Porretta, res ipsa* requires that

"(a) the event is of a kind which ordinarily does not occur in the absence of negligence;

(b) other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence; and

(c) the indicated negligence is within the scope of the defendant's duty to the plaintiff." 428 Mich. 132, 151 n. 6, 405 N.W.2d at 872–73 n. 6.

Boag contends that the evidence in the case at bar does not sufficiently eliminate the possibility that the spoilage occurred after the turkeys had left the warehouse. It is true that Cargill could not show precisely when the birds in question had been released from the warehouse, but this was because of deficiencies in Boag's own recordkeeping. If it is also true that there might have been enough time after the release from the warehouse for the turkeys to have thawed out, started to spoil, and then been refrozen, the chances of such a chain of events replicating itself simultaneously under the aegis of both Foodland and Borman—two totally independent distributors—would seem to be remote. "[N]egligence may exist on the part of a defendant without exclusive control depending upon the total circumstances of a given case," *Gadde*, 377 Mich. at 124–25, 139 N.W.2d at 726, and here the total circumstances provide an adequate factual foundation to support the jury's verdict.

## VII

■ Cargill asked the jury to award it damages of almost $2 million, including $860,966 to cover payments to customers, price adjustments for relocated inventory, and the cost of conducting the recall; $385,-176 to cover lost sales and additional storage costs and promotion expenses in 1992; and $776,250 to cover estimated lost sales and advertising expenses for 1993–96. The final judgment, rounded to the nearest dollar and not counting interest and court costs, was $820,981. We do not know what dollar amount was awarded for any particular category of losses claimed by Cargill, and the jury may or may not have included something for lost sales.

■ Boag maintains that it should have received a new trial on the issue of damages because the evidence associated with lost sales was incomplete. With respect to 1993, for example, Cargill's evidence showed that but for the injury to the "Honeysuckle White" brand name, sales of premium turkeys under that brand would be an estimated 1,350,000 pounds higher; that the company would lose 12.5 cents per pound on premium turkeys sold under a lower grade brand name; and that estimated lost sales for 1993 would thus total $168,750. The evidence showed that some additional costs were incurred in marketing premium turkeys as Honeysuckle Whites—the birds were packaged in higher grade bags, *e.g.*, and customers received unconditional money back guarantees—and Boag takes Cargill to task for failing to present evidence quantifying the costs saved by downgrading birds to a less-than-premium brand.

It is clear that Cargill was not entitled to package its premium turkeys in cheaper bags and recover losses calculated on the assumption that more expensive bags would be used. Damages for lost profits should reflect net profits, not gross profits. *Getman v. Mathews*, 125 Mich.App. 245, 335 N.W.2d 671 (1983). The jury knew that the marketing of the Honeysuckle Whites entails some additional costs, however, and if it awarded anything at all for lost sales, the jury presumably took that fact into account. Judge Zatkoff instructed the jury that certain of the elements of damage could not be proved in a precise dollar amount, and that the law leaves the amount to be awarded for such elements to the jury's sound judgment. "Your verdict must be solely to compensate the plaintiff for its damages," he continued, "and not to punish the defendant."

Considering the magnitude of the elements of damage as to which no issue has been raised, the jury's verdict appears conservative. If there was some error that favored Cargill in the calculation of damages, it was inconsequential. We are not persuaded that the trial court abused its discretion in denying Boag's motion for a new trial on this issue.

## VIII

■ Finally, Boag argues that it is entitled to a new trial because of an allegedly erroneous evidentiary ruling. Here is the factual context in which this issue arose.

During their initial investigation, according to the evidence, Cargill employees checked the production codes of the spoiled turkeys found in the Foodland distribution chain. Because Cargill's records indicated that

 

these particular turkeys had been sold to Borman, some of the investigators went to stores in Borman's chain to look for other spoiled turkeys. One of these men, Everett Fine, testified that on Saturday, November 23, 1991, he and another investigator, Jim Neary, found spoiled turkeys at a "Farmer Jack" store serviced by Borman. The turkeys in question had the same production codes as the spoiled turkeys found at Foodland. Jim Neary made contemporaneous notes that included the production codes. Later that day, at the team's hotel headquarters, the men reported their findings to the entire group.

Quality Assurance Director Gary Phillips was the head of the group to which Messrs. Fine and Neary reported. He took his own contemporaneous notes throughout the course of the investigation. He also took notes during the Saturday meeting at the team's hotel headquarters, writing down the production codes of the spoiled turkeys that Fine and Neary had discovered at the Farmer Jack store. Mr. Phillips typed up his notes some time later, and Cargill offered them in evidence at trial.

Boag objected to the admission of the Phillips notes, first on the basis that the notes should be used only to refresh Mr. Phillips' recollection and second because they contained hearsay. The district court found the notes admissible under the "present sense impression" exception to the hearsay rule. See Rule 803(1), Fed.R.Evid., which provides that the hearsay rule does not exclude "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter."

Mr. Phillips' testimony indicates that he took notes of events as they occurred. Neither direct nor cross-examination elicited any indication that Phillips changed his notes in any way when he typed them up. There is little "likelihood of deliberate or conscious misrepresentation" here, and the writing had sufficient "circumstantial guarantees of trustworthiness to justify its admission as evidence." Advisory Committee Notes to Rule 803(1), Fed. R. Evid; see also *Rock v. Huffco Gas & Oil,* 922 F.2d 272, 280 (5th Cir.1991).

Insofar as the Phillips notes incorporated Mr. Neary's findings, they constituted "hearsay within hearsay." Such hearsay is not excluded under the hearsay rule "if each part of the combined statements conforms with an exception to the hearsay rule...." Rule 805, Fed. R. Evid. That is the case here. The testimony of Mr. Fine establishes that Mr. Neary's findings qualify under the "present sense impression" exception. The record shows that Mr. Phillips obtained his information from one who was an eyewitness to what occurred at the scene and who recorded his observations contemporaneously. This is sufficient to make the "hearsay within hearsay" admissible. See *Meder v. Everest & Jennings,* 637 F.2d 1182, 1186 (8th Cir.1981). The district court's evidentiary ruling was correct, and there was no abuse of discretion or other error in denying the application for a new trial on this ground.

**AFFIRMED.**