**HEIDTMAN STEEL PRODUCTS, INC., Plaintiff/Counter–Defendant**

v.

**FAURECIA AUTOMOTIVE SEATING, INC., Defendant/Counter–Plaintiff.**

**Case No. 3:10CV575.**

United States District Court,
N.D. Ohio,
Western Division.

Jan. 2, 2013.

John Carey, Kimberly S. Kondalski, Jared J. Lefevre, Eastman & Smith, Toledo, OH, for Plaintiff/Counter–Defendant.

Kurt J. Lindower, Thomas Schank, Hunter & Schank, Toledo, OH, Marc. L. Newman, David B. Viar, Miller Law Firm, Rochester, MI, for Defendant/Counter–Plaintiff.

## ORDER

JAMES G. CARR, Senior District Judge.

This is a breach of contract case in which plaintiff/counter-defendant, Heidtman Steel Products, Inc. (Heidtman), claims defendant/counter-plaintiff, Faurecia Automotive Seating, Inc. (Faurecia), failed to pay money due under the parties' contract. Faurecia counterclaimed, alleging Heidtman also breached the contract and that it is entitled to an appropriate setoff.

Pending is Heidtman's motion to dismiss Faurecia's counterclaims (Doc. 70). For the reasons that follow, I deny the motion.

Jurisdiction exists under 28 U.S.C. § 1332.

## Background

Heidtman obtained cold and hot rolled steel from steel plants and sold it to third parties, whom the parties denominate as "stampers." Under separate contracts between the stampers and Faurecia, the stampers fabricated the steel into parts which Faurecia incorporated in car seats which Faurecia, in turn, provided to General Motors, Ford, and Chrysler.

The contract at issue in this case between Heidtman and Faurecia required Heidtman to sell steel to the stampers at a fixed price from April 1, 2009, to December 31, 2009. However, because steel prices often fluctuate significantly in short time periods, Heidtman and Faurecia agreed to correct for the difference in the contract's fixed price for the stampers and the actual price Heidtman had to pay for steel during the contract's duration. If Heidtman paid less for the steel than the fixed price, it would pay Faurecia the difference. If Heidtman paid more, Faurecia would pay Heidtman the difference.[1] The parties called these payments "true-ups."

The contract provided Heidtman, Faurecia, and the stampers with protection from steel-price market fluctuations. By entering into the contract, Heidtman would avoid losing money if steel prices increased, and, *vice versa*, Faurecia avoided

---

1. Subject to Heidtman remaining price "competitive." If Faurecia believed Heidtman's prices were higher than market, it could obtain other supplier bids to provide the steel. Heidtman retained the right of last refusal to match the lowest bid.

overpaying if prices decreased. Although the stampers were not parties to the contract, it also benefitted them. With it in place, the stampers knew they would pay Heidtman a fixed price for steel and would resell their product to Faurecia at a fixed price. They also knew they had a reliable supplier of steel so they could meet Faurecia's need to meet its production timetable with the auto manufacturers. Thus, the contract facilitated the manufacturing process by allowing the parties and stampers to realize profits independent on the steel market.[2]

Heidtman delivered steel to the stampers from April to August, 2009. In September and October, however, Heidtman failed to make its shipments. It resumed delivery, and made timely steel shipments to the stampers in November and December, 2009.

Heidtman sued, alleging Faurecia failed to pay true-ups for November and December. Faurecia acknowledged it did not pay Heidtman $142,817 in true-ups. However, Faurecia filed a counterclaim alleging that Heidtman failed to provide steel to the stampers in September and October, and the damages from Heidtman's breach of contract-offset Faurecia's unpaid true-ups.

Heidtman filed a motion for summary judgment arguing that, because Faurecia admitted it did not pay the true-ups, no issues remained and it was entitled to judgment on that claim. I denied the motion without prejudice in recognition that Heidtman may be liable to Faurecia for failing to deliver steel in September and October. (Doc. 69, p. 6).

Heidtman also sought summary judgment on Faurecia's counterclaim, which alleged Heidtman failed to deliver the steel to the stampers. Heidtman argued the contract fell outside Article 2 of the Uniform Commercial Code, and, thus, Faurecia could not recover damages for the increased cost of replacement steel and parts Faurecia bought from other suppliers after Heidtman's non-delivery. Heidtman also argued that, because Article 2 does not apply, Faurecia retains no further remedies under the contract. (Doc. 69, p. 6).

I held that Article 2 does not apply to the parties' contract because Faurecia merely served as a facilitator of the Heidtman-stampers contracts for the sale of goods. I therefore rejected Heidtman's Article 2 defenses. I suggested, without deciding, that Faurecia may retain common law remedies and Heidtman common law defenses.[3]

Heidtman filed this motion to dismiss, arguing Faurecia retains no remedies under the contract and has therefore failed to state a claim entitling it to relief. (Doc. 70).

## Standard of Review

A claim survives a motion to dismiss under Fed.R.Civ.P. 12(b)(6) if it "contain[s]

---

**2.** This arrangement assumed Faurecia could pass on the cost of steel to the OEM manufacturer by pricing its finished product according to the market price of steel.

**3.** I reject Faurecia's contention that Heidtman's motion to dismiss amounts to a motion for reconsideration. In my prior opinion and order, I partially granted Heidtman's motion for summary judgment, holding Article 2 does not apply to the parties' contract. Thus, I suggested that Faurecia "look to the common law of contracts for its remedies." I did not, as Faurecia contends, affirmatively hold it is entitled to common law remedies. I merely reserved this issue to decide another day. (Doc. 69, pp. 2, 8–9). Because I specifically reserved this issue and instructed the parties to consider it further, I also reject Faurecia's argument that Heidtman's motion is untimely. I therefore deny Faurecia's motion to strike Heidtman's motion to dismiss. (Doc. 73).

sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all of the complaint's allegations are true." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555–556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

A complaint is insufficient "if it tenders naked assertions devoid of further factual enhancement." *Iqbal, supra,* 556 U.S. at 678, 129 S.Ct. 1937 (citing *Twombly, supra,* 550 U.S. at 557, 127 S.Ct. 1955) (internal quotation omitted).

I must "construe the complaint in the light most favorable to the plaintiff." *Inge v. Rock Fin. Corp.,* 281 F.3d 613, 619 (6th Cir.2002). A plaintiff, however, must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly, supra,* 550 U.S. at 555, 127 S.Ct. 1955; *see also Iqbal, supra,* 556 U.S. at 678, 129 S.Ct. 1937 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

### Discussion

I first address Heidtman's argument that Article 2 of the Uniform Commercial Code precludes Faurecia's common law remedies as a matter of law. I conclude that it does not. I then examine the language of the parties' contract to determine whether it unambiguously restricts Faurecia's remedy to termination of the contract. I conclude that the contract is ambiguous: reasonably read, it could be interpreted as allowing Faurecia to recover remedies for its additional costs in obtaining replace-ment steel under the contract; it could also be read to preclude such recovery. Because the contract is ambiguous, its interpretation presents a question of fact. Faurecia has, therefore, pled a plausible claim for relief under the contract, and I deny Heidtman's motion to dismiss.

### 1. Faurecia's Potential Remedies

█ Heidtman argues that, although Article 2 does not apply to the parties' contract, Faurecia may only seek remedies under the UCC. It argues Faurecia must bring suit against the stampers under Article 2, rather than suing Heidtman under common law contract principles. The stampers, in turn, could bring suit against Heidtman. Heidtman contends this is Faurecia's exclusive remedy because the UCC preempts all common law remedies under contracts related to the sale of goods. For the following reasons, I reject this argument.

Heidtman relies on several Michigan cases, which, it contends, lead to the conclusion that Faurecia may only proceed against the stampers. Heidtman first cites *Neibarger v. Universal Cooperatives, Inc.,* 439 Mich. 512, 486 N.W.2d 612, 614 (1992), for the proposition that common law claims "do not exist along UCC claims." In *Neibarger,* the plaintiff, a milk producer, sued the defendant, who sold the plaintiff an allegedly defective milk-extrac-tion system. *Id.* The plaintiff alleged breach of contractual warranties and negli-gence. *Id.*

The Michigan Supreme Court held that the Article 2 statute of limitations applied to bar the plaintiff's claim. *Neibarger, supra,* 486 N.W.2d at 614. The court re-jected the plaintiff's argument that it could avoid the strict Article 2 limitations period by pleading a cause of action in tort. *Id.* Because the plaintiff only claimed econom-ic losses, the plaintiff could not recover under tort theories and only stated a cause

of action in contract. *Id.* Therefore, between the parties to an Article 2 contract alleging only economic loss, "the exclusive remedy is provided by the UCC[.]" *Id.* at 618. The court thus adopted the generally accepted rule that a party to a contract may not plead a case of "negligent contract performance" as a tort, but must sue for breach of the contract itself.

Heidtman relies on several other similar cases in arguing Faurecia may only seek Article 2 remedies. In *Fisher Sand & Gravel Co. v. Neal A. Sweebe, Inc.*, 293 Mich.App. 66, 810 N.W.2d 277, 279 (2011), the plaintiff sued under an action for open account against the defendant, which sold it allegedly defective goods. The court held that, despite the fact that an open account action is traditionally one in common law, the Article 2 limitations period applied to the contract. *Id.* at 282. This is so because, "[a]lthough an account stated is based on a separate agreement between the parties, it relates to and cannot be divorced from the underlying sales transaction." *Id.*

I find these cases distinguishable for two reasons. First, Heidtman's argument fails to recognize that these cases involved application of Article 2 when an Article 2 buyer sued its seller under a common law cause of action that inextricably arose from the Article 2 sales contract.

The parties in this case, however, did not enter into an Article 2 sales contract. Rather, their contract stated that Heidtman would supply goods to the third-party stampers. Heidtman and Faurecia would then later correct for market fluctuations by paying one or the other true-ups as necessary. Heidtman has failed to cite any authority leading to the conclusion that Article 2 precludes Faurecia from recovering under its common law contract merely because its damages arise as a result of Heidtman's breach of its Article 2 contracts with the stampers.

Second, the purpose behind the parties' common law contract was to ensure delivery of steel to the stampers and correct for price fluctuations after the fact. Thus, the purpose of the contract was to protect all concerned from likely, but unpredictable fluctuations in the steel market. The agreement facilitated the production process for both the stampers and Faurecia by protecting the parties from economic consequences of such fluctuations. In this way, the obligations and expectations of Heidtman and Faurecia under the contract remain distinct and separable from those in Heidtman's Article 2 contracts with the stampers.

I find this case analogous to *Cargill, Inc. v. Boag Cold Storage Warehouse, Inc.*, 71 F.3d 545, 547. (6th Cir.1995). In *Cargill*, the plaintiff, a turkey producer, entered into an Article 2 contract with a food distributor to ship turkeys to the defendant, a storage warehouse. *Id.* The warehouse had contracted with the food distributor to hold the turkeys until the distributor needed them. *Id.* The turkey producer and warehouse had no contractual relationship. *Id.*

The warehouse let the turkeys thaw. *Cargill, supra*, 71 F.3d at 549. The warehouse then, without notifying the producer or distributor, re-froze the turkeys and delivered them. *Id.* The turkeys were spoiled, which forced the producer to issue a massive recall shortly before Thanksgiving. *Id.*

The Sixth Circuit, applying Michigan law, concluded the producer could maintain a negligence claim against the warehouse. *Cargill, supra*, 71 F.3d at 550–551. The warehouse argued the damages arose from a contract involving the sale of goods, *i.e.*, the contract between the producer and the distributor. *Id.* Thus, the warehouse argued, the producer needed to sue the distributor, which could recover against

the warehouse. *Id.* The court rejected this argument, and held that the warehouse owed a duty to the producer as a foreseeable party that would be harmed by its actions. *Id.* at 551–552.

 Although that case involved a tort, rather than a common law contract, the outcome would necessarily be the same under common law contract. This is so because, as discussed above, under Michigan law a plaintiff may not bring a cause of action for "negligent performance" of contractual duties that were part of a contract. *Neibarger, supra,* 486 N.W.2d at 614. In other words, if the producer and warehouse had entered into a contract, the producer would have necessarily brought the claim under it.

This position is supported by a wrinkle in the *Cargill* case itself. There, the producer settled with the distributor and received all rights to sue the warehouse as an assignee of the warehouse-distributor common law contract. *Cargill, supra,* 71 F.3d at 552. The Sixth Circuit held, however, that there was "no legal principal requiring it to do so." *Id.* In effect, the producer had its choice whether to sue the warehouse under its tort action or the distributor's common law contract, which it acquired through settlement. *Id.* This was so despite the fact that all damages related to the Article 2 contract. *Id.*

This case also differs from *Cargill* in that the parties and contracts align differently. Here, Heidtman and the stampers entered into Article 2 contracts, the stampers and Faurecia entered into other Article 2 contracts, and Heidtman and Faurecia entered into a common law contract. In *Cargill,* as discussed above, the producer did not enter into a contract with the warehouse (but the warehouse owed the producer a duty in tort), the warehouse entered into a common law contract with the distributor, and the producer and distributor entered into an Article 2 contract.

Any differences are, however, without distinction. I read *Cargill* to stand for the proposition that a third-party does not lose common law remedies merely because it could alternatively recover under an avenue that took advantage of Article 2. Like the Sixth Circuit in *Cargill,* I find no legal principle requiring Faurecia to pursue a different route.

Other courts have reached similar results in debt collection cases related to the sale of goods. *Fallimento C.Op.M.A. v. Fischer Crane Co.,* 995 F.2d 789, 791 (7th Cir.1993); *United States v. Framen Steel Supply Co.,* 435 F.Supp. 681 (S.D.N.Y. 1977) (contract action brought by a governmental entity was not governed by UCC § 2–725, although it related to a sale of goods, because the contract sued on was one by which the plaintiff financed a purchase of goods by the defendant from a third-party, rather than the contract of sale itself.). In *Fallimento,* a seller received a promissory note in return for agreeing to sell goods to the buyer. 995 F.2d at 791. The court held that an action on the promissory note was subject to the Article 2 statute of limitations because the promissory note was, nevertheless, a promise to pay for the goods. *Id.* The court distinguished the case from those in which a third-party received a promissory note in return for financing a buyer-seller transaction, when the third-party did not acquire title to the goods. *Id.* Although such financing agreements, like the parties' contract in this case, facilitate Article 2 contracts, Article 2 does not govern the financing agreements because the obligations remain independent of the contract for the sale of goods. *Id.* I therefore reject Heidtman's argument that Article 2 necessarily precludes Faurecia from recovering common law contract remedies.

Additionally, the fact that Article 2 may provide similar remedies to those Faurecia

seeks at common law does not mean Article 2 preempts those remedies. To the contrary, Article 2 codified many common law contract remedies in the context of the sale of goods. Stated another way, Article 2 may preempt extra-statutory remedies when it applies; when it does not apply, however, it cannot restrict a party's common law remedies merely because they are similar to Article 2 remedies. This is buttressed by the maxim that a plaintiff may not recover avoidable losses, *i.e.*, a plaintiff must mitigate its damages. So a plaintiff may not recover under the common law for damages it could have avoided by contracting for available alternative services. In essence, this is a common law "cover" for services. This exact principal is encompassed in Article 2.

Heidtman also argues that Article 2 preempts the common law of contracts, and cites *Hoerstman Gen. Contracting, Inc. v. Hahn*, 474 Mich. 66, 711 N.W.2d 340, 346 (2006), in supporting this position. In that case, the plaintiff sued for breach of a construction contract. *Id.* The defendant asserted that it resolved the claim through an accord and satisfaction when it sent a check to the plaintiff which stated "final payment." *Id.* at 344. Although the check was for less than the amount the plaintiff had demanded, an accompanying letter showed that the defendant disputed the amount owed and that the check amount represented an offer to settle the dispute. *Id.* The plaintiff argued that it did not intend to settle the dispute when it cashed the check. *Id.*

The Michigan Supreme Court held that Article 3 preempts the common law with respect to accord and satisfaction in the context of negotiable instruments. *Hoerstman, supra*, 711 N.W.2d at 346. Because Article Three expressly provided for the elements of, and exceptions to, accord and satisfaction, the plaintiff was precluded from arguing extra-statutory exceptions, such as a lack of intent to settle. *Id.*

This case differs in that Article 3 applies to all negotiable instruments and provides specific instructions for analyzing an accord and satisfaction defense. MCL §§ 440.3102, 440.3311. It therefore applies broadly and contains particular rules under which to analyze an accord and satisfaction claim.

Article 2, to the contrary, only applies to the sale of goods and I have already held that it does not apply to this contract. MCL § 440.2102. It therefore applies more narrowly and does not speak to the particular situation that arose in this case. Article 2 thus cannot, and does not, preempt Faurecia's common law remedies.

### 2. Faurecia's Actual Contractual Remedies

■ Heidtman argues the parties' contract explicitly limits Faurecia's remedies to termination of the contract. Faurecia reads the same language explicitly to allow it to recover for Heidtman's failure to supply steel to the stampers.

■ "In interpreting a contract, [a court's] obligation is to determine the intent of the contracting parties." *Quality Products & Concepts Co. v. Nagel Precision, Inc.*, 469 Mich. 362, 666 N.W.2d 251, 259 (2003). "[A]n unambiguous contractual provision is reflective of the parties' intent as a matter of law." *Id.* "If the language of the contract is unambiguous, we construe and enforce the contract as written." *Id.* However, when a contract is ambiguous, the parties' are not restricted to the language of the contract in proving their intent. *Klapp v. United Ins. Group Agency, Inc.*, 468 Mich. 459, 663 N.W.2d 447, 454 (2003). Extrinsic evidence of the parties conduct, the statements of representatives, and past practice can be used to aid in interpreting the contract. *Id.* Additionally, "courts must ... give effect

to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Id.* at 453, 663 N.W.2d 447.

The parties read the following contractual language differently:

Heidtman is responsible for meeting all Stamper's delivery release schedules. If Heidtman fails to meet any Stamper steel releases requirements, and this failure results in downtime and additional costs, Heidtman will be solely responsible for any and all costs related to its failure. Heidtman to advise stampers in writing of mill lead-time changes. Any costs associated with mill delivery or quality issue must be discussed or approved by Heidtman prior to assessment by the stamper.

\* \* \*

This agreement is subject to Heidtman remaining competitive and meeting all of the stampers' delivery releases over the Contract Period. If Heidtman does not remain competitive, Heidtman will have the right of last refusal to competitive pricing. [Doc. 70–1.]

Heidtman suggests that the language in the first paragraph specifically limits its liability to the stampers, and Faurecia's remedy to termination of the contract. The language supports this conclusion to the extent that the paragraph regarding Heidtman's liability mentions the stampers but not Faurecia. Thus, it is entirely plausible that the parties meant, in effect, "If Heidtman fails to deliver timely steel to the stampers, Heidtman will be solely responsible to the stampers." In essence, the stampers must sue Heidtman, and Faurecia agreed to only sue the stampers for their failure to deliver the refined steel. This conclusion is buttressed by the last two sentences, which discuss how the stampers and Heidtman should resolve mill delivery costs and quality issues

among themselves, without Faurecia's involvement.

Faurecia argues Heidtman's reading impermissibly ignores the crux of the parties' agreement. Faurecia argues the clause states the terms that obligate Heidtman to deliver the steel and, further, made clear Heidtman could not claim the stampers were responsible for its failure. That is, "Heidtman must deliver timely steel to the stampers when they request it, and if it fails to meet the stampers requirements, Heidtman will be solely responsible to Faurecia for Faurecia's losses." That the parties included estimates regarding the amount of steel Heidtman would deliver buttresses this reading of the contract. The parties would have no need to estimate a quantity if Heidtman made no firm commitment to deliver any steel to the stampers. If Faurecia could not recover for Heidtman's failure to deliver to the stampers, its contract with Heidtman had little meaning and no real benefit for Faurecia. It gave Faurecia little assurance it would be able timely to provide the seats its buyers had ordered. If the parties intended the contract to facilitate the manufacturing process, this result would directly contradict and undermine that purpose.

The parties also disagree about the meaning of the language in the second paragraph. Heidtman contends it means that, if it failed to deliver to the stampers or provided steel at a price Faurecia deemed too high, Faurecia could terminate the contract. Heidtman would counterargue that this was merely another price safeguard, *i.e.,* if Heidtman was not competitive with market prices Faurecia could force it to correct by seeking estimates from other suppliers. Heidtman would then be forced to match a lower estimate or allow Faurecia to make a better deal elsewhere. Thus, it did not allow simple termination, but forced the parties to rene-

gotiate Heidtman's price before either party could terminate. Essentially, then, it provided a remedy alternative to termination.

I find both of these arguments plausible and do not read the contract to require either result. Because the contract, read and considered as a whole, is susceptible to two reasonable meanings, it is ambiguous. Which interpretation the parties intended presents a question for the trier of fact. *Klapp, supra,* 663 N.W.2d at 454 (When a contract's "meaning is obscure and its construction depends upon other and extrinsic facts in connection with what is written, the question of interpretation should be submitted to the jury, under proper instructions.").

### Conclusion

For the foregoing reasons, it is hereby ORDERED THAT:

1. Heidtman's motion to dismiss (Doc. 70) be, and the same hereby is, denied; and

2. Faurecia's motion to strike (Doc. 73) be, and the same hereby is, denied.

So ordered.